**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

FILED

OCT 0 1 2021

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

P.M. a minor, by and through her parent,
Terpsehore Maras,

      Plaintiffs,

      v.                          Civ. No. 1:21-cv-01711-SO

MAYFIELD CITY SCHOOL DISTRICT
BOARD OF EDUCATION; DR.
MICHAEL J. BARNES, in his individual
capacity and in his official capacity as
Superintendent of the Mayfield City School
District; and RON FORNARO, SUE
GROSZEK, AL HESS, GEORGE J.
HUGHES, and JIMMY TERESI, all in their
individual capacities and in their capacities
as members of the Mayfield City School
District Board of Education,

      Defendants.

## FIRST AMENDED, SUPPLEMENTAL, AND RESTATED COMPLAINT WITH DEMAND FOR JURY TRIAL

Plaintiffs, P.M. a minor, by and through her parent, Terpsehore Maras, *pro se*, hereby file this First Amended, Supplemental, and Restated Complaint with Demand for Jury Trial against Defendants, Mayfield City School District Board of Education ("School Board"); Dr. Michael J. Barnes, in his individual capacity and in his official capacity as Superintendent of the Mayfield City School District; and Ron Fornaro, Sue Groszek, Al Hess, George J. Hughes, and Jimmy Teresi, all individual elected officials sued in their individual capacity and in their capacity as members of the School Board (collectively, "Defendants"). In support of the claims set forth herein, Plaintiffs allege and aver as follows:

1

## INTRODUCTION

Through the unlawful actions of Defendants, Plaintiff Terpsehore Maras has been deprived of her right to care for and maintain custody and control of her minor child, P.M. Specifically, by implementing an unconstitutional universal mask mandate despite have no sound scientific basis for doing so, Defendants have ordered P.M. to involuntarily participate in a healthcare service in violation of Article I, § 21 of the Ohio State Constitution, whereby P.M. is required to wear a mouth covering and to subject herself to contract tracing.

As a result, solely at the discretion of Defendants, P.M. is required to undergo the perpetual implementation of the collection of healthcare information under the guise of a purported state of emergency. Such an unbridled assault on P.M.'s civil liberties should not and *must not* be allowed to stand. Despite the Court's order denying Plaintiffs' request for a Temporary Restraining Order, Plaintiffs herein place the Court and Defendant on notice that they will be filing an updated request for injunctive relief in the coming days based on the updated information and arguments contained herein.

In addition, the United States Court of Appeal for the Sixth Circuit has noted, "In reviewing a Complaint, the Court must construe the pleading in the light most favorable to the Plaintiff." *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 561 (6th Cir. 1998). Yet, in reliance on outdated and constitutionally repugnant Sixth Circuit case law, Defendants' attorneys, and even the Court itself, have suggested that Plaintiff Terpsehore Maras has no legally cognizable right to defend the legal interests of her minor child, P.M. – even though P.M. is not recognized by the judicial system as having the ability to bring her own lawsuit against the Defendants due to her status as a minor.

The absurd result of such a position would be that Ohioan parents would not be able to represent their minor children *pro se* and instead would have to bear the often exorbitant expense of hiring an attorney to represent the children. Therefore, although parents in Ohio have the financial

obligations for and are vicariously liable for the actions of their minor children, they are prohibited from protecting the legal interests of the minor children to which they are financially and vicariously responsible. Such a scenario is devoid of any modicum of rationality.

Moreover, Article I, § 21 of the Ohio State Constitution expressly prohibits federal, state, and local laws or rules from compelling, directly or **_indirectly_**, any person, employer, or health care provider to participate in a health care system. Thus, the Constitution of the State of Ohio unambiguously affords individuals like Terpsehore Maras the right to seek redress from the courts when unconstitutional actions, whether directly or indirectly, infringe upon the rights of Ohioans. Because the universal mask mandate unconstitutionally places P.M. in danger of suffering irreparable and immediate injury, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## CHANGES FROM ORIGINAL COMPLAINT

Plaintiffs reallege the allegations set forth in their original Complaint as if stated in full herein. As a summary of the changes made in this new filing, Plaintiffs note the following:

- Plaintiffs have added an introduction section to briefly touch on their new constitutional arguments and to address the Defendants' contention that Plaintiff Terpsehore Maras does not have standing to represent her minor child *pro se* to challenge the Defendants' dangerous and scientifically unsound universal mandate.

- Plaintiffs allege additional causes of action under the Ninth and Tenth Amendments to the United States Constitution as well as Article I, § 21 of the Ohio State Constitution.

3

- Plaintiffs substitute the document designated as Exhibit O, the original Affidavit of Stephen O. Petty and accompanying exhibits, for an updated version of Mr. Petty's Affidavit with updated exhibits.

- Plaintiffs attach as Exhibit Q, *in globo*, the affidavits of hundreds of fellow Americans in support of Plaintiffs' allegations.

- Plaintiffs formally request a Trial by Jury.

## **PARTIES**

1.       Plaintiff P.M. is a minor child who resides in Mayfield City School District ("MCSD"), in Cuyahoga County, Ohio. Plaintiff P.M. is and was at all times relevant hereto a student at a Mayfield City School District public school.  Suit is brought herein on P.M.'s behalf by her mother, Plaintiff Terpsehore Maras.

2.       Plaintiff Terpsehore Maras is an adult individual who is a resident and taxpayer in the Mayfield City School District, in Cuyahoga County, Ohio. Plaintiff Terpsehore Maras is the parent of Plaintiff P.M.

3.       Defendant Mayfield City School District Board of Education (the "School Board" or the "Board") is a public entity which, acting under color of law, is responsible for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for the Mayfield City School District.

4.       Defendant Dr. Michael J. Barnes was at all relevant times the Superintendent of the Mayfield City School District; in that capacity, acting under color of law, he is responsible for the implementation of all official governmental laws, policies, regulations and procedures governing the Mayfield City School District. He is sued in his official and individual capacities.

5.      Defendant Ron Fornaro is a Cuyahoga County resident and member of the School Board, sued here in his individual and representative capacity. Mr. Fornaro is currently the President of the School Board.

6.      Defendant Sue Groszek, is a Cuyahoga County resident and member of the School Board, sued here in her individual and representative capacity.

7.      Defendant Al Hess is a Cuyahoga County resident and member of the School Board, sued here in his individual and representative capacity.

8.      Defendant George J. Hughes is a Cuyahoga County resident and member of the School Board, sued here in his individual and representative capacity.

9.      Defendant Jimmy Teresi is a Cuyahoga County resident and member of the School Board, sued here in his individual and representative capacity. Mr. Teresi is currently the Vice President of the School Board.

10.      At all relevant times hereto, the School Board and the individual Defendants were acting under color of state law.

## JURISDICTION AND VENUE

11.      Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

12.      This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331, 28 U.S.C. §§1343(a)(3), (4), 28 U.S.C. §1367, 28 U.S.C. § 2201, and 42 U.S.C. §1983.

13.      There exists an actual and justiciable controversy between Plaintiffs and Defendant requiring resolution by this Court.

14.      Plaintiffs have no adequate remedy at law.

15.     Venue is proper before the United States District Court for the Northern District of Ohio under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the Northern District of Ohio.

## FACTS

16.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

**A.      Mayfield School District Board of Education**

17.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

18.     The Mayfield School District Board of Education is "composed of five citizens who are representatives of the residents of Gates Mills, Highland Heights, Mayfield Heights and Mayfield Village. Board members are elected 'at large' on a nonpartisan ballot and serve for staggered terms of four years." https://www.mayfieldschools.org/BoardofEducation.aspx.

19.     The five individuals currently serving as School Board Members are Defendants Ron Fornaro, Sue Groszek, Al Hess, George J. Hughes, and Jimmy Teresi.

20.     Defendant Dr. Michael J. Barnes, Superintendent of the District, holds a doctorate degree in Leadership & Organizational Development, a master's in Secondary School Administration, and a bachelor's degree in Political Science.

21.     Defendant Ron Fornaro, the President of the School Board, has a Bachelor of Science in Business Administration. On January 10, 2018, Mr. Fornaro signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Vice-President of the School Board (though he is now President of the School Board) to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit A.**

6

22.    Defendant Sue Groszek has a bachelor's degree in deaf education. On January 8, 2020, Ms. Groszek signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge her duties as a Board Member to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit B.**

23.    Plaintiffs cannot confirm whether Defendant Al Hess holds a college degree.  On January 8, 2020, Mr. Hess signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Board Member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit C.**

24.    Defendant George J. Hughes has a bachelor's degree in criminology.  On January 10, 2018, Mr. Hughes signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Board Member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit D.**

25.    Plaintiffs cannot confirm whether Defendant Jimmy Teresi, the Vice President of the School Board, holds a college degree. On January 10, 2018, Mr. Teresi signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Board Member (though he is now Vice-President of the School Board) to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit E.**

26.    This five-member School Board unanimously appointed Defendant Dr. Michael J. Barnes to serve as Superintendent of Schools, effective July 1, 2021.

27. As Superintendent, Dr. Barnes is charged with the administration of the MCSD.

**B.    Relevant Policies of the Mayfield School District Board of Education**

28. Code po0118 of Section 0000 of the School Board's policy manual, titled "PHILOSPOHY OF THE BOARD", provides,

> The Board's philosophy of education gives direction to the educational program and daily operations of the District. (AD)
>
> The primary responsibility of the Board is to establish purposes, programs and procedures which produce the educational achievement needed by District students. The Board must accomplish this while also being responsible for wise management of resources available to the District. The Board must fulfill these responsibilities by functioning primarily as a legislative body to formulate and adopt policy, by selecting an executive officer to implement policy and by evaluating the results; further, it must carry out its functions openly, while ***seeking the involvement and contributions of the public, students, and staff in its decision-making processes.***
>
> In accordance with these principles, the Board seeks to achieve the following goals to:
>
> \*\*\*
>
> ***formulate Board policies which best serve the educational interests of each student***
>
> \*\*\*
>
> ***maintain effective communication with the school community, the staff, and the students in order to maintain awareness of attitudes, opinions, desires, and ideas***
>
> \*\*\*
>
> ***conduct Board business openly, soliciting and encouraging broad-based involvement in the decision-making process by public, students, and staff***
>
> \*\*\*

http://go.boarddocs.com/oh/mayoh/Board.nsf/goto?open&id=BETTSC6DA88E (emphasis added).

29. In addition, the Board's Policy Manual at Section 000, Code po0121 provides,

The United States Constitution leaves to the individual state's responsibility for public education.

The Ohio General Assembly is under mandate by the Constitution of Ohio to provide for the organization, administration and control of a public school system supported by public funds. The Ohio State Constitution also calls for a State Board of Education and a Superintendent of Public Instruction.

The General Assembly has outlined the duties of the State Board of Education and the Chief State School Officer. It has also established a State Department of Education (through which policies and directives of the State Board and Superintendent of Public Instruction are administered) and has established specific types of school districts.

The Mayfield City School District is classified as a city school district governed by a locally elected Board of Education, hereinafter referred to as the "Board", which is constituted and governed by Code Title 33 of the Revised Code of the State of Ohio.

http://go.boarddocs.com/oh/mayoh/Board.nsf/goto?open&id=BETTSD6DA898.

30. Furthermore, for its "STATEMENT OF PHILOSPHY", the Policy Manual at Section 0000, Code po2110 declares,

The Board of Education believes that the purpose of education is to facilitate the development of the potential of each student. ***In a free society, every individual has both the right and responsibility to make choices and decisions for himself/herself and for society. A prerequisite for every member of such a society in meeting those responsibilities is competence in the use of the rational thought processes needed to make intelligent, ethical choices and decisions. If our society, as originally conceived, is to survive and function effectively, its young people need to be prepared to exercise their rights and their responsibilities in ways that benefit them and the society. Likewise, if individuals are to be able to achieve their life goals in a free society, they need to be competent to choose among the myriad alternatives that are and continue to be available to them.***

9

http://go.boarddocs.com/oh/mayoh/Board.nsf/goto?open&id=BETTUY6DAC2C        (emphasis

added).

31.     The Board Policy also provides in Section 0000, po0131, in pertinent part,

> Proposals regarding Board policies and operations may originate at any of
> several sources, including students, community residents, employees,
> Board members, the Superintendent, consultants or civic groups. ***A careful
> and orderly process is used when examining policy proposals prior to
> Board action.***

> The formulation and adoption of written policies constitute the basic
> method by which the Board exercises its leadership in the operation of the
> District. The study and evaluation of reports concerning the execution of
> its written policies constitute the basic method by which the Board
> exercises its control over District operations.

http://go.boarddocs.com/oh/mayoh/Board.nsf/goto?open&id=BETTSJ6DA8CC.        (Emphasis

added).


32.     Moreover, Section 8000, Code po8420.01, titled "PANDEMICS AND OTHER

MEDICAL EMERGENCIES", provides, in pertinent part,

> A pandemic is an outbreak of an infectious disease. The Board of
> Education directs the Superintendent to set up a Pandemic Response Team
> ("PRT") to develop a Pandemic Plan in coordination with local
> government and law enforcement officials.

> ***

> The Pandemic Plan should be reviewed annually by the PRT and updated
> as appropriate.

> http://go.boarddocs.com/oh/mayoh/Board.nsf/goto?open&id=BETU686
> DB887.

33.     Additionally, Mayfield Board Policy 8450.01, adopted by the Board on September

23, 2020 and attached hereto as **Exhibit F**, explains that the Superintendent's decision to require

protective facial covering during pandemic and epidemic events was made "through Board of

Education plans/resolution(s) in alignment with public health officials and/or in accordance with government edicts and including any Pandemic Plan developed by the District's Pandemic Response Team under Policy 8420.01." Notably, the Policy states, "***Facial masks/coverings generally should not include surgical masks*** or respirators ***unless medically indicated (as those should be reserved for healthcare workers)*** or masks designed to be worn for costume purposes." *Id.* (emphasis added).

34.     Finally, Mayfield Board Policy Section 1000, po1130, titled "CONFLICT OF INTEREST", provides, in pertinent part,

> A. The proper performance of school business is dependent upon the maintenance of unquestionably high standards of honesty, integrity, impartiality, and professional conduct by Board of Education's members, and the District's employees, officers, and agents. Further, such characteristics are essential to the Board's commitment to earn and keep the public's confidence in the School District. For these reasons, the Board adopts the following guidelines to assure that conflicts of interest do not occur. These guidelines apply to all District employees, officers and agents, ***including members of the Board***. These guidelines are not intended to be all inclusive, nor to substitute for good judgment on the part of all employees, officers, and agents.
>
>> 1. No employee, officer, or agent shall engage in or have a financial interest, directly or indirectly, in any activity that conflicts or raises a reasonable question of conflict with his/her duties and responsibilities in the school system.
>>
>> 2. Employees, officers, and agents shall not engage in business, private practice of their profession, the rendering of services, or the sale of goods of any type where advantage is taken of any professional relationship they may have with any student, client, or parents of such students or clients in the course of their employment or professional relationship with the School District.
>
> ***
>
> C. Employees, officers, and agents can not participate in the selection, award, or administration of a contract supported by a Federal grant/award if s/he has a real or apparent conflict of interest. Such a conflict of interest would

11

arise when the employee, officer, or agent, any member of his/her immediate family, his/her partner, or an organization which employs or is about to employ any of the parties described in this section, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract.

Employees, officers and agents can not solicit or accept gratuities, favors, or anything of monetary value from contractors or parties to subcontracts. Unsolicited items of nominal value, however, may be accepted. The Ohio Licensure Code of Professional Conduct stipulates the nominal value of gifts to be less than $25.

\*\*\*

E. Employees, officers and agents must disclose any potential conflict of interest which may lead to a violation of this policy to the School District. Upon discovery of any potential conflict of interest, the School District will disclose, in writing, the potential conflict of interest to the appropriate Federal awarding agency or, if applicable, the pass-through entity.

The District will also disclose, in a timely manner, all violations of Federal criminal law involving fraud, bribery or gratuity that affect a Federal award to the appropriate Federal awarding agency or, if applicable, the pass-through entity.

See attached **Exhibit G** (emphasis added).

## C. MCSD's COVID-19-Based Measures

35.     Through Board Action 0202-060, the Board unanimously adopted the following

resolution, attached hereto as **Exhibit H**:

The Mayfield Board of Education recommended to adopt the suspension of community communications due to the Coronavirus as delineated in the public content section:

WHEREAS, On March 11th, 2020 the World Health Organization officially declared that COVID-19, a novel coronavirus, to be a pandemic. Shortly afterward, Governor Mike DeWine issued Executive Order 2020-01D declaring Ohio to be in a state of emergency. The Ohio Department of Health also ordered that all K-12 schools be closed to students at least through May 1, 2020. Similarly, residents have been ordered to remain at home until that date to slow the spread of the disease.

WHEREAS, on March 25th, 2020 the Ohio General Assembly passed an emergency measure through House Bill 197 which temporarily authorizes boards of education and other local government agencies to hold remote meetings during the duration of a health emergency. The provisions of HB 197 will remain in effect until December 1, 2020 or until the COVID-19 emergency ceases, whichever comes first.

\*\*\*

WHEREAS, the Mayfield Board of Education continues to work diligently to address ***the many challenges that COVID-19 has caused and is likely to cause in the future as well as complying with and modeling behaviors consistent with the stay at home order.***

NOW, THEREFORE, BE IT RESOLVED by the Mayfield Board of Education that it ***suspends community communications / public comments section of its regular meeting agendas until the COVID-19 emergency ceases.***

Exhibit H (emphasis added).

36.     In June 2021, the MCSD, through Defendant Michael J. Barnes, issued a "Plan for Safe Return to In-person Instruction". See **Exhibit I**. In its "Policy for Mitigation Strategies Section", the MCSD states, "We are anticipating that the health and safety protocols will continue to be practiced during the 2021-22 school year. This, of course, depends on orders from the Governor and the Board of Health. These guidelines are changing, but you can anticipate that we will require wearing masks and social distancing when in hallways, classrooms, common spaces and cafeterias." *Id.* at p. 2. The Plan also included a statement that "The Mayfield City School District seeks public input regarding the District's plans for a safe return to in-person instruction for the 2021-22 school year. Please call 440.995.6800." *Id.* at p. 4.

37.     On August 4, 2021, the MCSD, through Defendant Dr. Michael J. Barnes, issued a Mask Recommendation to Mayfield teachers, staff, parents, and students, in which the MCSD stated,

Our goals for our students, staff, and community:

13

● Maintain a healthy and safe environment

● Keep our students learning in person, together, in our schools

● Provide choice

Late this summer, the Centers for Disease Control and Prevention (CDC), the American Academy of Pediatrics (AAP) and Ohio Department of Health (ODH) released updated recommended guidance on the safe return to school for students and staff. There are several key takeaways that serve as the foundation for the Mayfield City School District's reopening plan this school year:

**<u>Face masks in grades Pre-K-12 are strongly recommended for our students, teachers and staff.</u>**

**➔ Wearing a face mask may greatly reduce the risk of students, teachers and staff having to quarantine if a COVID -19 positive case/s are reported in any of our Mayfield schools.**

**➔ It is your right to wear or not wear a face mask. We support either decision. Please be respectful of the choice of our students, teachers and staff.**

See **Exhibit J**.  The Mask Recommendation also provides, in pertinent part,

2. As of this date, there is **no state-wide required masking mandate** for the 2021-2022 school year for staff or students.

3. **The Mayfield City School District supports all students or staff members in their <u>choice</u> to wear a face mask.** It is important to note that the Ohio Department of Health **strongly recommends** masks be worn indoors by all individuals who are not fully vaccinated (age 2 years and older). The CDC and CCBH as of August 3, 2021, now recommend that all individuals (vaccinated or not) wear a mask while indoors where community transmission is high.

*Id.* at pp. 1-2 (emphases in original). In addition, the Mask Recommendation states that "**Wearing a face mask may greatly reduce the risk of students, teachers and staff having to quarantine if a COVID-19 positive case/s are reported in any of our Mayfield schools.** We will continue to monitor the guidance and recommendations of the Centers for Disease Control and Prevention, State of Ohio and Cuyahoga County Board of Health." *Id.* at p. 2 (emphasis in original).

14

38.    On August 21, 2021, Defendant Dr. Michael J. Barnes sent an e-mail to Mayfield

teachers, staff, parents, students and community (the "mask mandate") stating as follows:

> Earlier this week, the district issued a face mask mandate in Grades Pre-K-5 to
> protect our younger students who are ineligible for a COVID-19 vaccine, along with
> a strong recommendation for students in grades 6-12 to wear a face mask.
>
> ***The decision to issue a mandate to students 12 years and younger was supported
> by the survey the district conducted August 12-14th. Those survey results also
> indicated most parents intended for their children in grades 6-12 to wear a mask
> while in school.***
>
> Students returned to campus during phase-in schedules, beginning August 16th with
> all students on campus at full capacity on August 18th. ***During this week, school
> officials have observed very few students in grades 6-12 wearing face masks. This
> is concerning. Our priorities for this school year are to maintain the health and
> safety of our school community and continue learning in person, in school,
> together.***
>
> Therefore, pursuant to Mayfield Board Policy 8450.01 Mayfield City Schools will
> mandate face masks in all school buildings for all students, teachers, staff and
> visitors in grades Pre-K-12, effective Monday, August 23rd. We will review the
> mandate weekly and give updates at regular Board of Education meetings.
>
> ***The district's Pre-K-12 face mask mandate for students, staff and visitors in our
> schools is our best organizational strategy to support and protect our students'
> academic time and to maintain a stabilized learning environment.***
>
> \*\*\*
>
> See attached **Exhibit K** (emphases added.)

**D. Plaintiffs Place Defendants on Notice of Lawsuit.**

39.    Upon receiving the Superintendent's e-mail, Plaintiff, Terpsehore Maras, e-mailed

a response to the Defendants informing them that she would be filing a lawsuit due to the

Defendants' violation of Ohio's open meetings laws and violation of the United States and Ohio

Constitutions through their commission of unauthorized restrictions of liberty; identification of a

minor as a potential public health risk with no jurisdiction; identification and declaration of a minor

as a potential public health risk with no evidence; declaration of mandates to restrict a minor's liberty with no legal jurisdiction; declaration of mandates that have no legal jurisdiction to restrict civil liberties; declaration of mandates restricting liberties with no prior public comment; declaration of mandates imposing dress code that does not align with dress code regulations; declaration of mandates as medical experts; and deprivation of students' and parents' civil liberties with no authority." See **Exhibit L.**

40.    In her letter, Ms. Maras also informed Defendants that she was sending a copy of the letter to Ohio Attorney General David Yost, a copy of which letter is attached hereto as **Exhibit M**.

41.    Ms. Maras concluded her letter by noting that she would be seeking a temporary restraining order unless the purported "mandate" was not rectified by the close of business on August 23, 2021. See Exhibit M.

**E. August 25, 2021 Regular Meeting of the School Board**

42.    Thereafter, on August 23, the School Board issued its agenda for its next regular meeting, scheduled for Wednesday, August 25. See **Exhibit N**. The agenda indicated that the mask mandate would be discussed at the meeting. *Id.*

43.    At the August 25, 2021, meeting, Plaintiff, Terpsehore Maras, approached the School Board members to speak during open discussion of the mandate despite objections from the School Board that Ms. Maras did not have the right to speak since she did not submit an application to speak.  In fact, Ms. Maras had arrived at the meeting location and completed an application to speak long before the mask mandate discussion commenced but no one from the School Board accepted Ms. Maras's application to speak.

44.     Once she was finally permitted to speak, which was at the end of the mask mandate discussion, Ms. Maras first notified the School Board that upon learning the School Board would be discontinuing public comments during virtual meetings due to COVID, she e-mailed the Board members to ask why public comments were being disabled given that, to her knowledge, COVID cannot be transmitted via a computer or telephone. Ms. Maras stated at the meeting that the Board never replied to her e-mail and that she was never invited to comment on the Superintendent's decision to reinstate to mask mandate on August 20.

45.     Ms. Maras also informed Defendants that she was in possession of pictures recently taken of the Defendants at parties not wearing masks.  Moreover, she explained that went she arrived at the Superintendent's office on August 23 to hand-deliver the notice of intent to sue, she encountered three individuals, the Assistant Superintendent, the Assistant to Superintendent Michael J. Barnes, and a third employee, who were not wearing masks despite the mask mandate requiring them to do so.

46.     Ms. Maras, referring to guidance from the Center for Disease Control and Prevention ("CDC"), also pointed out that in contravention to the School Board's masks mandate for students in grade Pre-K through 5, the CDC holds the position that masks mandates for children that young are detrimental and have zero efficacy.

47.     In addition, Ms. Maras noted that the Board likely violated its Conflict Interest Policy (see Exhibit G) through its provision of a lottery award to a student enrolled in a Mayfield City School District school.  Specifically, Defendant Ron Fornaro is employed through the Ohio Lottery Commission and serves under the Director and Staff of the Ohio Lottery Commission as an Instant Ticket Product Manager. Mr. Fornaro also shares a seat on the Mayfield Schools Foundation as the Board of Education's appointee. See https://mayfieldschoolsfoundation.org/board-bios. Mr.

Fornaro's family itself has been interest of many Mayfield city alleged nepotism controversies.  For example, see https://www.cleveland.com/hillcrest/2014/04/mayfield_heights_service_depar.html. In addition, Upon information and belief, the Foundation itself has engaged in a number of conflicts of interest outside of Mr. Fornaro's Ohio Lottery connection, such as connections to Chris Smith whose firm, ThenDesign Architecture, has received money from Mayfield city schools for architectural projects, and connections to Mary Beth Mac, who is a Program Manager at the Cleveland Clinic Community Relations. The Mayfield Schools Foundation's Board also retains Defendant George Hughes, who sits on that board as a community member. *Id.*  Curiously, and beyond what should be a statistical anomaly, a Mayfield High School student was announced the winner of the Vax-a-million lottery in an entry that was participated by 132,000 Ohioans between the ages of 12-17. The lottery was operated through the Ohio Lottery Commission and the Ohio Department of Health. Ms. Maras stated her belief that the granting of a lottery award to a student in a school district served by Mr. Fornaro's was likely a conflict of interest, which would have resulted in the Board violated its policy (see Exhibit G).

48.     Ms. Maras concluded her public comments at the School Board meeting by informing Defendants that she would be removing each of the Defendants in accordance with law for misconduct and that she would be retaining the assistance of an expert environmental toxicologist who is qualified to speak to the health and safety benefits of masks.

**F. The Masking Requirement Causes Immediate and Irreparable Harm to Students, Staff, and Community.**

49. In his Affidavit, attached hereto as **Exhibit O**, Stephen E. Petty, an expert in the field of Industrial Hygiene who has testified as to the futility and danger caused by an individual wearing a mask in order to avoid transmitting or becoming infected with Covid-19, states the following:

\*\*\*

2. Since April 14, 1996, I have owned and operated EES Group, Inc., a consultancy corporation specializing in health and safety and forensics.

3. I hold relevant industry certifications including board certifications as a C.I.H. (Certified Industrial Hygienist), a C.S.P. (Certified Safety Professional), and a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas, and West Virginia). My curriculum is attached hereto as **Exhibit i**.

4. I have served as an expert in personal protective equipment and related disciplines in approximately 400 legal cases. I am certified in and have provided testimony as an expert in these areas. My list of representative cases is attached hereto as **Exhibit ii**.

5. For example, I am currently serving as an expert in the Monsanto Roundup and 3M PFAS litigation. Recently I testified in four trials for the DuPont C8 litigation.

6. I taught Environmental and Earth Sciences as an adjunct professor at Franklin University.

7. I hold nine U.S. patents relating to heating, ventilation and air conditioning (HVAC) systems.

8. I am a current member in good standing of the following relevant associations: American Industrial Hygiene Association (AIHA), American Board of Industrial Hygiene (ABIH), American Conference of Governmental Industrial Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE); Member ASHRAE 40 Std. and TC 2.3, and Sigma Xi.

9. I am an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors — including viruses — arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community.

10. Industrial Hygiene is fundamentally concerned with the proper methods of mitigating airborne/dermal hazards and pathogens, as well as with the design and use of engineering controls, administrative controls, and personal protective equipment, among other things.

11. Medical doctors, virologists, immunologists, and many public health professionals are not qualified experts in these areas by virtue of those aforementioned credentials.

12. On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic (https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html).

13. Airborne viral aerosols can consist of a single viral particle or multiple viral particles clumped together, and usually smaller than 5 μ (microns) in size. By comparison, droplets are >5 μ to >10 μ in size.

14. The area of a micron by a micron is approximately 1/4,000th of the area of the cross-section of a human hair and 1/88th the diameter of a human hair. Covid particles are 1/10 of a micron or ~1/40,000th of the area of a cross section of a human hair and ~1/880th the diameter of a human hair.

15. A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25μ to 0.5μ in size. Particles smaller than 5μ are considered very small and/or very fine or aerosols (https://www.ijidonline.com/action/showPdf?pii=S1201-9712%2821%2900375-1).

16. Very small particles do not fall by gravity in the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks.

17. Because they stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor.

18. Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

19. Exposure to airborne aerosols is a function of two primary parameters: concentration and time. Less is better regarding both parameters.

20. For many reasons, personal protective equipment (PPE) is the <u>least</u> desirable way to protect people from very small airborne aerosols. Moreover, masks are not PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPS), namely 29 CFR 1910.134 (https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134).

21. Regarding PPE, facial coverings do not effectively protect individuals from exposure to very small airborne aerosols. A device referred to as a respirator is required to provide such protection.

22. The AIHA, in its September 9, 2020 Guidance Document for COVID-19 noted that the acceptable relative risk reduction methods must be >90%; masks were shown to be only 10% and 5% (see Figure 2) and far below the required 90% level (https://aiha-assets.sfo2.digitaloceanspaces.com/AIHA/resources/Guidance-Documents/Reducing-the-Risk-of-COVID-19-using-Engineering-Controls-Guidance-Document.pdf).

23. Similarly, Shah et al, 2021, using ideally sealed masks and particles 1 micron in size, reported efficiencies for the more commonly used cloth masks and surgical masks of 10% and 12% respectively. No mask can be perfectly sealed, thus "real world" effectiveness would be even lower (https://aip.scitation.org/doi/pdf/10.1063/5.0057100).

24. Industrial hygienists refer to a "Hierarchy of Controls" that are typically implemented to minimize exposures, including exposures to very small airborne aerosols like Covid-19.

25. Regarding practical or "engineering" controls, industrial hygienists focus on practices that dilute, destroy, or contain airborne hazards (or hazards in general).

26. PPE — especially facial coverings — do not dilute, destroy, or contain airborne hazards. Therefore, facial coverings are not contained in the Industrial Hygiene (IH) Hierarchy of Controls. Even respirators (part of the PPE Category and not masks) are in the last priority on the Hierarchy of Controls.

27. Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. Thus, ordinary facial coverings <u>do not</u> provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection.

28. For example, during the seasonal forest fires in the summer of 2020, the CDC issued public guidance warning that facial coverings provide no

protection against smoke inhalation. That is because facial coverings do not provide a reliable level of protection against the small particles of ash contained in smoke. Ash particles are substantially larger than Covid-19 aerosolized particles.

29. I have reviewed the policy of the Mayfield City School District (MCSD) regarding the use of masks.

30. Ordinary facial coverings like the ones required by the MCSD mask policy do not meet any of the several key OSHA Respiratory Protection Standards for respirators.

31. Because of the gaps around the edges of facial coverings required by MCSD's policy, they do not filter out Covid-19 aerosols. The policy stating masks will be worn without gaps defies known science that masks worn today cannot be sealed and always have gaps.

32. The effectiveness of a cloth facial covering falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering.

33. Most over-the-counter disposable facial coverings including cloth and/or over-the-counter disposable surgical masks have edge gaps of 10% or more. When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10%.

34. Even short breaks (e.g. to eat) expose individuals to Covid-19 aerosols in indoor spaces.

35. Ordinary cloth facial coverings like the ones required by the MCSD's mask requirement do not provide any filtering benefit relative to particles smaller than $5\mu$ if not sealed.

36. Substantial mitigation of Covid-19 particles could be immediately achieved by:

    a. opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),

    b. setting fresh air dampers to maximum opening on HVAC systems,

    c. overriding HVAC energy controls,

    d. increasing the number of times indoor air is recycled,

    e. installing needlepoint ionization technology to HVAC intake fans, and

f. installing inexpensive ultraviolet germicide devices into HVAC systems.

37. All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling exposures in place for nearly 100 years. The use of cloth facial coverings do not fit within these basic hierarchy of controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

38. Extended use of respiratory PPE is not indicated without medical supervision.

39.     As explained in a recent April 20, 2021 paper by Kisielinski et al, attached hereto as **Exhibit iii** and entitled "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?" that was published in the *International    Journal of Environmental   Research    and    Public Health* (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8072811/), the following negative effects from wearing masks was reported in the literature:

| Increased risk of adverse effects when using masks: | | |
|---|---|---|
| **Internal diseases**<br>COPD<br>Sleep Apnea Syndrome<br>advanced renal Failure<br>Obesity<br>Cardiopulmonary Dysfunction<br>Asthma | **Psychiatric illness**<br>Claustrophobia<br>Panic Disorder<br>Personality Disorders<br>Dementia<br>Schizophrenia<br>helpless Patients<br>fixed and sedated Patients | **Neurological Diseases**<br>Migraines and Headache Sufferers<br>Patients with intracranial Masses<br>Epilepsy |
| **Pediatric Diseases**<br>Asthma<br>Respiratory diseases<br>Cardiopulmonary Diseases<br>Neuromuscular Diseases<br>Epilepsy | **ENT Diseases**<br>Vocal Cord Disorders<br>Rhinitis and obstructive Diseases<br><br>**Dermatological Diseases**<br>Acne<br>Atopic | **Occupational Health Restrictions**<br>moderate / heavy physical Work<br><br>**Gynecological restrictions**<br>Pregnant Women |

**Figure 5.** Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

Example statements made in the paper include the following: "The overall possible resulting measurable drop in oxygen saturation (O2) of the blood on the one hand and the increase in carbon dioxide (CO2) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." Exhibit iii, p. 25. In fact, "Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population)." Exhibit iii, p. 24, for these reasons, students who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, or damage.

40. A recent summary of the literature on these topics was produced on September 4, 2021 and is attached is **Exhibit iv**; in summary it proves that:

a. PPE is the least desirable way to protect people from very small airborne aerosols.

b. Facial coverings as required by the MCSD's policy are not recognized as PPE since they cannot be sealed and are not covered by the OSHA RPS.

c. If PPE were to be used for protection, respirators, not facial coverings as required by the MCSD's policy are needed to provide any effective protection from very small airborne aerosols.

d. Very small aerosol particles are more likely to be a greater cause of disease than respiratory droplets because they can evade PPE and reach deep into the lungs, whereas respiratory droplets have to work against gravity in order to travel up a person's nose into the sinus and typically rapidly fall to the ground.

24

f.  <u>Based on cited literature, individuals who are required to wear masks pursuant to a mandate have the known potential to suffer immediate and irreparable injury,  loss, and damage due to the overall possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.</u>

g.  ***As demonstrated, it seems rational (i.e. prudent person) and scientifically corroborated (in accordance with indisputable, Industrial Hygiene Science/Engineering evidence) that facial coverings/masking DO NOT "prevent the spread of communicable diseases" even close to the relative risk reduction guidance stated by AIHA.***

   ***<u>Also, from an industrial hygiene exposure control perspective, I am confident that, beyond a reasonable doubt, facial coverings/masking DO NOT "prevent the spread of communicable diseases," in this case SARS CoV-2 and its collection of symptoms known as COVID-19 based on the literature since  masks cannot be sealed. Further, even N-95 respirators, which can be sealed,  are not recommended by a key manufacturer (3-M) to stop biological infectious diseases "The respirator ... cannot eliminate the risk of infection,  illness, or disease."</u>***

h.  ***<u>Finally, from an industrial hygiene (i.e., exposure control) standpoint, much   better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction), and should be used to minimize exposures as opposed to masks.</u>***

50.     Plaintiffs note that the state of Ohio was given $4,475,243.513 pursuant to the American Rescue Plan ("ARP") Act of 2021 by agreeing to implement the federal guidelines set forth by the CDC for COVID-19 mitigation efforts.  See the attached letter from the U.S. Secretary of Education, attached hereto as **Exhibit P**.  See also, https://oese.ed.gov/files/2021/07/Ohio-ARP-ESSER-State-Plan-Highlights-v2-071421.pdf. The letter links to the CDC guidelines available at https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html.  The guidelines suggest that a school board would forfeit ARP allocations by making masks optional, and states that have prohibited mask mandates in schools have received letter

notifying them that they will not receive ARP funds.  Accordingly, it seems Defendants have a financial incentive for implementing the mask mandate, despite that such a requirement serves no scientific purpose and subjects individuals who wear masks to the health risks discussed above.

51.     Plaintiffs attach **as Exhibit Q,** ***in globo,*** the affidavits of hundreds of fellow Americans in support of Plaintiffs' allegations. Courts across the nation can continue to expect to receive the pleadings of angry parents who are angered by the arbitrary and nonsensical measures being implemented by school boards under the guise of caring for American children when, in fact, it appears many individuals associated with these schools boards are receiving financial incentives for unnecessarily and unconstitutionally masking children. Such an injustice will not be allowed to stand.

52.     Plaintiff Terpsehore Maras, in her own capacity and on behalf of her minor child, P.M., is aggrieved by the immediate and irreparable injury, loss, and damage suffered by P.M. because P.M. is required to wear a mask pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT I - 42 U.S.C. §1983 - Violation of Procedural Due Process
### (5th and 14th Amendments) Against All Defendants

53.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

54.     In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

55.     In the instant case, Defendants unquestionably acted under the color of state law.

56.     Each Individual Defendant is an elected, voting member of the Mayfield City School District Board of Education with the exception of Defendant Dr. Michael J. Barnes, who is the Superintendent of the Mayfield City School District.

57.     Under the Fifth Amendment to the Constitution, no person may be deprived of life, liberty, or property without due process of law. U.S. Const. Ann., Amendment V.

58.     The Fourteenth applies the protections of the Fifth Amendment to state actors. U.S. Const. Ann., Amendment XIV.

59.     Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

60.     Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates the Fifth and Fourteenth Amendments of the Unites States Constitution.

61.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## COUNT II - 42 U.S.C. §1983 - Violation of Substantive Due Process
## (Fourteenth Amendment) – Against All Defendants

62.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

63.     In the instant case, Defendants unquestionably acted under the color of state law.

64.     Each individual Defendant is an elected, voting member of the Mayfield City School District Board of Education with the exception of Defendant Dr. Michael J. Barnes, who is the Superintendent of the Mayfield City School District.

65.     Under the Fourteenth Amendment to the Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

66.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT III - Violation of Ninth Amendment Against All Defendants

67.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

68.     Under the Ninth Amendment to the Constitution, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

69.     Nothing in the United States Constitution states or even suggest that parents of minor children do not have the right to seek redress in the courts in order to protect the health and safety of their children, and thus, Plaintiff Terpsehore Maras retains this right to protect her minor child, Plaintiff P.M.

28

70.    By relying on scientifically unfound and constitutionally repugnant guidance by federal government agencies and enacting an oppressive a dangerous universal mask mandate in misguided reliance on the information provided by the federal government, Defendants have violated Plaintiffs' Ninth Amendment rights by usurping Plaintiff Terpsehore Maras' right to protect the health and safety of her minor child.

### COUNT IV - Violation of Tenth Amendment Against All Defendants

71.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

72.    Under the Tenth Amendment to the Constitution, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

73.    The Supreme Court of the United States has determined that overreach by the federal government has in the past violated the Tenth Amendment of the United States Constitution found that federal overreach has in the past violated the Tenth Amendment. See *Printz v. United States*, 521 U.S. 898 (1997).

74.    Defendants have violated Plaintiffs' Tenth Amendment rights infringing upon their rights, along with the rights of other students, parents, and school staff through violating Plaintiff's rights under Article 1, § 21 of the Ohio Constitution, pertaining to the preservation of the freedom to choose health care and health care coverage.

### COUNT V - Violation of OH Const. Art. I, § 21 Against All Defendants

75.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

76.    Article 1, § 21 of the Ohio Constitution, pertaining to the preservation of the freedom to choose health care and health care coverage, provides,

(A) No federal, state, or local law or rule shall compel, directly or indirectly, any person, employer, or health care provider to participate in a health care system.

(B) No federal, state, or local law or rule shall prohibit the purchase or sale of health care or health insurance.

(C) No federal, state, or local law or rule shall impose a penalty or fine for the sale or purchase of health care or health insurance.

(D) This section does not affect laws or rules in effect as of March 19, 2010; affect which services a health care provider or hospital is required to perform or provide; affect terms and conditions of government employment; or affect any laws calculated to deter fraud or punish wrongdoing in the health care industry.

(E) As used in this Section,

(1) "Compel" includes the levying of penalties or fines.

(2) "Health care system" means any public or private entity or program whose function or purpose includes the management of, processing of, enrollment of individuals for, or payment for, in full or in part, health care services, health care data, or health care information for its participants.

(3) "Penalty or fine" means any civil or criminal penalty or fine, tax, salary or wage withholding or surcharge or any named fee established by law or rule by a government established, created, or controlled agency that is used to punish or discourage the exercise of rights protected under this section.

77.     Article I, § 21 of the Ohio State Constitution expressly prohibits federal, state, and local laws or rules from compelling, directly or *__indirectly__*, any person, employer, or health care provider to participate in a health care system. Thus, the Constitution of the State of Ohio unambiguously affords individuals like Terpsehore Maras the right to seek redress from the courts when unconstitutional actions, whether directly or indirectly, infringe upon the rights of Ohioans.

78.     Because the universal mask mandate unconstitutionally places P.M. in danger of suffering irreparable and immediate injury, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased

noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase, the universal mask mandate implemented by Defendants violates Plaintiffs' rights under Article I, § 21 of the Ohio State Constitution.

### COUNT VI - Violation of Procedural Due Process
### (OH Const. Art. I, § 16) Against All Defendants

79.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

80.     Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

81.     Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

82.     Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

83.     Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates Article 1, § 16 of the Ohio Constitution.

84.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT VII - Violation of Substantive Due Process
### (OH Const. Art. I, § 16) Against All Defendants

85.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

86.     Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

87.     Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

88.     Under Article 1, § 16 of the Ohio Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

89.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## **RESERVATION OF RIGHTS**

Plaintiffs herein expressly reserve their rights in regards to any additional claims to which they may be entitled under federal law as well as under the laws of the State of Ohio, including claims arising from any violations of Ohio's Open Meetings Laws or other actions of misconduct that may have been committed by Defendants.  Plaintiffs expressly place Defendants on notice of Plaintiffs' intention to initiate removal proceedings at the state court level against Defendants as a result of the infractions Defendants have committed, as described herein.

## **REQUEST FOR A JURY TRIAL**

Plaintiffs herein expressly request that this matter be tried by a jury in regards to all such triable issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.  Assume jurisdiction of this action;

b.  Vacate and set aside the Defendants' mask mandate as well as any other action taken by Defendants to institute the mask mandate and implement the provisions of the mask policy;

c.  Declare that the Defendants' masking policy is void and without legal force or effect;

c.  Declare that the institution of the mask policy and actions taken by Defendants to implement the mask policy are arbitrary, capricious, based on ignorance due to failure to inquire into facts, otherwise not in accordance with law, and without observance of required procedures;

d.  Declare that the mask policy and the actions taken by Defendants to implement the mask policy are in violation of the Constitution and contrary to the laws of the United States and the State of Ohio;

e.  Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or

participation with any of them, from implementing or enforcing the mask policy and from taking any other action to implement the masking policy that is not in compliance with applicable law;

f.    Grant Plaintiffs' request for a trial by jury of all such triable issues in this matter; and

g.    Grant such other and further relief as may be just, equitable, and proper including without limitation, an award of attorneys' fees and costs to Plaintiffs.

Respectfully submitted this 1st day of October, 2021.

/s/ Terpsehore Maras
410 Superior Ave., #14597
Cleveland, OH 44114
xxx-xxx-xxx       (Telephone)
Terpsehore Maras, Individually and on behalf
of her minor child P.M.