# EXHIBIT "A"

# IN THE
# SUPREME COURT OF OHIO

| | |
|---|---|
| **State ex rel. TERPSEHORE MARAS,** | Case No: 2021-1140 |
| *Relator,* | |
| v. | Original Action in Mandamus |
| **GOVERNOR MIKE DEWINE,** | |
| *Respondent.* | |

## BRIEF IN OPPOSITION TO MOTION TO DISMISS AND IN SUPPORT OF ISSUANCE OF MANDAMUS WRIT AND REFERRAL TO MASTER COMMISSIONER FOR THE PRESENTATION OF EVIDENCE, HEARINGS, AND ORAL ARGUMENT

Relator Terpsehore Maras
410 Superior Ave., #14597
Cleveland, OH 44114
Tel: (503) 430-0000
mayfieldparentsunion@gmail.com

## **TABLE OF CONTENTS**

**TABLE OF CONTENTS**............................................................................................I

**TABLE OF AUTHORITIES** .....................................................................................III

**PRELIMINARY STATEMENT**..................................................................................1

**FACTUAL BACKGROUND** .....................................................................................2

**ARGUMENT** ....................................................................................................**13**

    POINT I.................................................................................................... 13

    RELATOR'S COMPLAINT SEEKS TO COMPEL RESPONDENT TO DISMANTLE ALL ASPECTS OF THE OHIO COVID-19 HEALTH CARE SYSTEM VIOLATIVE OF ARTICLE I, SECTION 21 OF THE OHIO CONSTITUTION ...................................................................................... 13

        *1.*    *The Complaint seeks a mandatory injunction that is well taken in this Court*.......... 16

        *2.*    *No other venue would provide Relator with an adequate remedy given none could provide "complete, beneficial, and speedy" relief* ............................................... 22

    POINT II................................................................................................... 25

    RELATOR AND THE MANY OHIOANS WHO TOOK THE TIME TO FILE AFFIDAVITS IN SUPPORT OF THIS PUBLIC COMPLAINT HAVE A REAL INTEREST IN THIS MATTER AND ADEQUATE STANDING ................................................................................................................. 25

        *1.*    *Standing in this action arises under the public-right doctrine* ................................... 26

        *2.*    *Standing in this action also arises given the concrete injuries sustained by Relator and Affiants* ...................................................................................................... 28

        *3.*    *Standing in this action also arises given the violations in question impact constitutional rights* ........................................................................................... 32

    POINT III.................................................................................................. 33

RELATOR SEEKS A MANDATORY INJUNCTION APPLYING ARTICLE I, SECTION 21 OF THE OHIO CONSTITUTION TO DISMANTLE THE OHIO COVID-19 HEALTH CARE SYSTEM .......................... 33

    1.    *Respondent will exercise full executive discretion when dismantling the Ohio COVID-19 Health Care System*...................................................................................................... 33

    2.    *Article I, Section 21 of the Ohio Constitution does not need legislative assistance for its interpretation or enforcement*....................................................................................... 35

**CONCLUSION**..............................................................................................................**38**

## TABLE OF AUTHORITIES

**CONSTITUTION**

Ohio Constitution Article I, Section 21.................................................................................. 2, 15

Ohio Constitution, Article IV, Section 2(B)(3) ............................................................................ 14

**CASES**

*Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001) ......................................................... 33

*Dahl v. Bd. of Trs. of W. Mich. Univ.*, No. 21-2945, Slip Op. (6th Cir. October 7, 2021) ............... 32

*Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)............................... 32

*Ex parte Milligan* (1886), 71 U.S. (4 Wall.) 2 .............................................................. 25

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994) ..................... 32

*Hughes v. Scaffide* (1978), 53 Ohio St.2d 85, 372 N.E.2d 598 ...................................... 14

*O'Neil v. Thomson*, 114 N.H. 155 (1974)................................................................... 35

*ProgressOhio.org, Inc. v. JobsOhio* (2014), 139 Ohio St.3d 520, 13 N.E.3d 1101 ........................ 26

*Provens v. Stark County Board of Mental Retardation & Development Disabilities* (1992), 64
    Ohio St. 3d 252, 594 N.E.2d 959 ...................................................................... 38

*Rutherford v. M'Faddon* (1807), Pollack, Ohio Unreported Judicial Decisions Prior To 1823
    (1952) at 73 ......................................................................................... 25

*State ex rel. Bush v. Spurlock* (1989), 42 Ohio St.3d 77, 537 N.E.2d 641...................................... 13

*State ex rel. Clark v. Johnson* (1995) 120 N.M. 562 ...................................................... 27

*State ex rel. Fenske v. McGovern* (1984), 11 Ohio St.3d 129, 464 N.E.2d 525 ............................ 18

*State ex rel. Gen. Motors Corp. v. Indus. Comm*. (2008), 117 Ohio St.3d 480, 884 N.E.2d 1075 .....
    ....................................................................................................... 17, 35

*State ex rel. Hodges v. Taft* (1992), 64 Ohio St.3d 1, 591 N.E.2d 1186 ........................................ 35

*State ex rel. Husted v. Brunner* (2009), 123 Ohio St.3d 119, 914 N.E.2d 397 (2009) ................... 35

*State ex rel. McCleary v. Roberts* (2000), 88 Ohio St.3d 365, 725 N.E.2d 1144 ............................ 5

*State ex rel. Meyer v. Henderson* (1883), 38 Ohio St. 644 ........................................................... 27

*State ex rel. Ohio Acad. of Trial Lawyers v. Sheward*, (1999) 86 Ohio St.3d 451, 715 N.E.2d 1062 (1999) ...................................................................................................................... 24, 26

*State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 145, 228 N.E.2d 631 .............. 14

*State ex rel. Smith v. Cuyahoga Cty. Court of Common Pleas* (2005), 106 Ohio St. 3d 151, 832 N.E.2d 1206 ..................................................................................................................... 23

*State ex rel. Smith v. Indus. Comm.* (1942), 139 Ohio St. 303, 39 N.E.2d 838 ............................. 18

*State ex rel. Toledo v. Lynch* (1913), 87 Ohio St. 444, 101 N.E. 352 ........................................... 14

*State v. Smith* (1989), 45 Ohio St. 3d 255, 544 N.E.2d 239 ........................................................ 25

*State v. Williams* (2000), 88 Ohio St. 3d 513, 728 N.E.2d 342 ..................................................... 37

*State, ex rel. Butler, v. Demis* (1981), 66 Ohio St. 2d 123, 420 N.E. 2d 116 ................................ 24

*State, ex rel. Liberty Mills, Inc., v. Locker* (1986), 22 Ohio St. 3d 102, 488 N.E. 2d 883 .............. 24

*State, ex rel. Ohio State Racing Comm., v. Walton* (1988), 37 Ohio St. 3d 246, 525 N.E. 2d 756 24

*State, ex rel. Scott, v. Masterson* (1962), 173 Ohio St. 402, 183 N. E. 2d 376 ............................. 35

*Sullivan v. State ex rel. O'Connor* (1932), 125 Ohio St. 387, 181 N.E. 805 ................................... 18

**STATUTES**

21 U.S.C. § 321(h) ...................................................................................................................... 21

Ohio Rev. Code § 2731.01 ........................................................................................................... 13

Ohio Rev. Code § 2915.01(BBB) ................................................................................................... 18

Ohio Rev. Code § 3770.08(B), (C) ................................................................................................. 19

**RULES**

Civ. R. 12(B)(1) .................................................................................................................. 13

S. Ct. Prac. R. 12.10 ...................................................................................................... 2, 22

S. Ct. Prac. R. 12.02(B)(1) .............................................................................................. 29

**REGULATIONS**

Ohio Admin. Code § 109:9-1-01(A) ................................................................................ 19

## PRELIMINARY STATEMENT

---

> *"We must be free not because we claim freedom,*
> *but because we practice it."*  – William Faulkner

---

Relator's Complaint may be inartful but nevertheless withstands all of Respondent's challenges and should proceed.  By way of her Complaint, Relator respectfully requests that this Court address the actions of Ohio's highest executive and the applicability of a Constitutional Amendment that is mandatory and admits of no discretion.  Relator appreciates that mandamus is an extraordinary remedy, however, Respondent's extraordinary actions merit the extraordinary remedy sought.  Relator also recognizes this remedy is only typically appropriate where a state official is under a mandatory duty to perform an act required by law as part of that official's duties and where the mandamus does not dictate the exercise of discretion or judgment.   As set forth below, Relator's request properly fits within such standard.

The Attorney General's office has moved to dismiss the Complaint claiming there is no subject matter jurisdiction for the Complaint given only "prohibitory injunctions" are sought.  Respondent also argues there is no standing given Relator has sustained no cognizable injury.

Respondent ignores the hundreds of pages of affidavits placed alongside the Complaint that carefully describe applicable concrete injuries as well as the caselaw that instructs on the sufficiency of the Complaint's asserted jurisdictional grounds.  At its essence, Relator and the many Ohioans standing shoulder-to-shoulder with Relator only seek to compel Respondent to perform specific mandatory duties correctly and in conformance with the Ohio Constitution.

## FACTUAL BACKGROUND

On March 9, 2020, Respondent issued Executive Order 2020-01D.  *See* Affidavit of

Terpsichores Maras in Opposition to Motion to Dismiss, dated October 16, 2021 ("Maras Aff."),

Exh. "A". This was the first step in creating what is hereinafter termed the "Ohio COVID-19

Health Care System".[1]    Respondent's Executive Order provides as follows:

> NOW THEREFORE, I, Mike DeWine, Governor of the State of
> Ohio, by virtue of the authority vested in me by the Constitution,
> the laws of this State and in accordance with Section 5502.22 of
> the Ohio Revised Code do hereby order and direct that:
>
> ******
> 3.  After consultation with the appropriate medical
> experts, **the Department of Health shall create and require the
> use of diagnostic and treatment guidelines and provide those
> guidelines to health care providers, institutions and providers**.
>
> 4.  **The Department of Health issue guidelines for private
> businesses regarding appropriate work and travel restrictions, if
> necessary**.
>
> 5.  **State agencies shall develop and implement
> procedures, including suspending or adopting temporary rules
> within an agency's authority, consistent with recommendations
> from the Department of Health designed to prevent or alleviate
> this public health threat.**

---

[1] The Ohio COVID-19 Health Care System consists primarily of Respondent's Executive Orders, Ohio regulatory amendments, and Ohio local rules whose function or purpose includes the management of, processing of, enrollment of individuals for, in full or in part, health care services, health care data, or health care information for its participants. *See* Ohio Constitution Article I, Section 21.   Should this Court take the Complaint as well taken, Relator respectfully requests that this Court refer the action to a master commissioner for the purpose of making recommendations as to the scope and constitutionally repugnant elements of the Ohio COVID-19 Health Care System. *See* S. Ct. Prac. R. 12.10.  Respectfully, only after hearings with the full and active participation of Respondent will these two symbiotic issues be adequately explored. Respondent's participation is also crucial given that *how* the Ohio COVID-19 Health Care System gets dismantled remains subject to the complete discretion of Respondent.

Maras Aff., Exh. "A" (emphasis added).

For months afterwards, Order after Order was issued by Respondent.  Maras Aff., Exh.

"B".  These Orders allowed changes to then-existing rules and regulations promulgated by the

Ohio Board of Pharmacy; the Ohio Counselor, Social Worker, and Marriage and Family Therapist

Board; the Ohio Department of Mental Health and Addiction Services; the State Vision

Professionals Board; the State Board of Education and Ohio Department of Education; the Ohio

Department of Medicaid; the Ohio Department of Developmental Disabilities; and the Ohio

Department of Aging.  *Id*.

The ensuing regulatory changes – all promulgated in response to these Executive

Orders, allowed previous regulations and rules to be suspended in conformance with mandates

specifically set forth within the Ohio COVID-19 Health Care System.  As the backbone for each

of these many new requirements, the Ohio Department of Health (DOH) compelled Ohioans to

adhere to numerous health care mandates.

Effective June 2, 2021, some of these DOH health mandates were rescinded – another

reason why this Court could benefit from a master commissioner sorting through and helping

understand the exact parameters of the unlawful Ohio COVID-19 Health Care System.  Maras

Aff. ¶ 13.  For example, the following orders remain in effect to this day:

> The Director's Amended Order to Require Screening for
> Admission to State Operated Psychiatric Hospitals or to
> Department of Youth Services Facilities, signed March 14,
> 2020.
>
> The Director's Order Designating The Ohio State University
> Wexner Medical Center a Public Health Laboratory, signed
> March 27, 2020.

The Director's Order to Facilities to Notify Residents, Guardians and Sponsor of Positive or Probable Cases of COVID-19, signed April 15, 2020.

The Director's Order Requiring Reporting and Notification Regarding COVID-19 Cases in Kindergarten through Twelfth Grade, signed September 3, 2020.

The Director of Health's Order Designating Dayton Children's Hospital as a Public Health Laboratory, signed December 23, 2020.

The Director's Seventh Amended Order to Permit Access to Ohio's Nursing Homes, with Exceptions, signed March 22, 2021.

The Amended Director's Order to Permit Access to Ohio's Residential Care Facilities, with Exceptions, signed March 22, 2021.

The Director's Amended Order for the Testing of the Residents and Staff of all Residential Care Facilities, signed May 4, 2021.

The Director's Amended Order for the Testing of the Residents and Staff of all Nursing Homes, signed May 4, 2021.

Maras Aff., Exh. "G"

Similarly, even though the "Ohio Public Health Advisory System" launched in July 2020 as part of the Ohio COVID-19 Health Care System has been canceled, the DOH to this day collects COVID-19 data under such system. *See* Maras Aff. ¶ 6. (Ohio Public Health Advisory System - (Archived) ("On Thursday, May 27, 2021, Ohio Department of Health Director Stephanie McCloud announced the cancellation, effective immediately, of the Ohio Public Health Advisory System. The statewide alert system launched in July 2020 to assess the degree of COVID-19 spread by county and provide data to help guide individuals, businesses, schools,

communities, local governments, and others in their response and actions during the pandemic. As cases decline and vaccinations increase, this data is no longer the best measure of Ohio's current status. **The Ohio Department of Health will continue to share COVID-19 cases, hospitalizations, deaths, current trends, key metrics, and vaccination data daily at coronavirus.ohio.gov**." (emphasis added).

It goes without saying, before the DOH can share "COVID-19 cases, hospitalizations, deaths, current trends, key metrics, and vaccination data", such personal data must first be collected from Ohioans and processed by the DOH. This personal information obtained by way of the Ohio COVID-19 Healthcare System does not consist of "public records" merely given their public use. If that were the case, the records would be subject to disclosure under a public record request and clearly, they are not. *See State ex rel. McCleary v. Roberts* (2000), 88 Ohio St.3d 365, 370, 725 N.E.2d 1144 ("We, therefore, find that personal information of private citizens, obtained by a "public office," reduced to writing and placed in record form and used by the public office in implementing some lawful, regulatory policy is not a "public record" as contemplated by R.C. 149.43.").

This DOH COVID-19 data collection process entails many touchpoints. For example, if Ohioans "Have questions?" regarding the Ohio COVID-19 Health System, Ohioans are instructed: "For answers to your COVID-19 questions, call 1-833-4-ASK-ODH (1-833-427-5634), available from 9 a.m. to 8 p.m. daily." Maras Aff. ¶ 7. Indeed, Ohioans are also informed, "you can also chat with our Virtual Assistant at gettheshot.coronavirus.ohio.gov for any COVID-19 vaccine, registration, and scheduling questions." *Id.* The **https://gettheshot.coronavirus.ohio.gov** website does not provide any efficacy and safety information necessary for true informed

consent – only a few links to various bold pronouncements regarding the confirmed safety and effectiveness of the vaccines **with a link to a "Book My Appointment" link**. *See e.g.*, Maras Aff., Exh. "D"

If not already "mandated" by the DOH, governmental coercion used to force COVID-19 vaccines on Ohioans is now only slightly below that level.  DOH and Respondent perhaps believe they can evade constitutional scrutiny by simply not "mandating" vaccines.  No matter what vantage point this Court deploys, however, the DOH will always be seen as compelling, directly or indirectly, that Ohioans participate in the Ohio COVID-19 Health Care System.

Since May 2021, the Ohio COVID-19 Health Care System has actively recruited Ohioans to enroll in a "vaccination" program.  Indeed, the DOH – a state agency under the control of Respondent, even assists in the booking of COVID-19 vaccines:



*See* Maras Aff., Exh. "D" (Ohio DOH "Get the Shot" Homepage (Publicly available at https://gettheshot.coronavirus.ohio.gov/).

To further convince Ohioans to enroll in and obtain selected health care services, the

DOH's "Myths vs. Facts COVID-19 Vaccine" section of its COVID-19 portal states:  "Evidence

shows immunity provided by the COVID-19 vaccines outlasts natural immunity":



Maras Aff. ¶ 9.

This asserted DOH "FACT" – which was still on the DOH website as of October 16, 2021,

is completely belied by the fact COVID-19 "boosters" which were recently approved by the FDA

for certain individuals after only **months** of being vaccinated while an overwhelming amount of

research during the past several months shows that natural immunity lasts much longer.  *See*

Maras Aff. ¶ 10 (providing citations to 23 studies).  In contrast, vaccinations – other than, for

example, Tetanus and its booster given **after ten years**, generally do not ever need a "booster".

By definition (or at least the CDC's accepted definition in place on August 26, 2021), a vaccine

provides immunity to disease and the efficacy of a "vaccine" does not degrade in mere months.

Sometime after August 26, 2021 – apparently after the results began flying in the door,

the CDC recognized that the current COVID-19 vaccines were not really "vaccines" under prior

CDC definitions, so the CDC simply changed its longstanding vaccine definition and **removed** the

CDC requirement that vaccines actually produce immunity before being deemed a "vaccine".

These modifications speak for themselves and need no expert analysis or contrived explanation:

> "Vaccine:   A product that stimulates a person's immune
> system **to produce immunity to a specific disease, protecting**
> **the person from that disease**."
> *https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm*
> *August 26, 2021, as found on Archive.org* (emphasis added)
>
> ──────────────────────────
>
> "Vaccine:    A preparation that is used to stimulate the body's
> immune response against diseases."
> https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm
> October 16, 2021, as found on current CDC website

Maras Aff. ¶ 13; Maras Aff., Exh. "F".

The National Institute of Allergy and Infectious Diseases also previously had this to say

about vaccines:  "Vaccines, **which provide artificially acquired immunity, are an easier and less**

**risky way to become immune**. Vaccines can prevent a disease from occurring in the first place,

rather than attempt to cure it after the fact."  Maras Aff. ¶ 14 (emphasis added).

**The CDC and DOD's motivations do not matter for purposes of the Complaint**.  All that

matters is that the Ohio COVID-19 Health Care System – which includes prodding private

Ohioan companies into requiring COVID-19 vaccines as a condition of employment or obtaining

a higher education, undermines constitutionally afforded health care freedoms.

If the Complaint does not proceed, DOH Director Dr. Bruce Vanderhoff – a doctor who

presumedly understands COVID-19 is a disease with a 99.9% survival rate for those 25 and

younger,[2] will continue compelling our young into making potentially life changing health care

decisions for no apparent reason:

> If you are young and unvaccinated it's now probably only a question of when, not if, you get COVID-19. **When you get COVID-19 without the protection of a vaccine, there is a very real risk you'll end up in the hospital or the obituary pages**. The numbers really tell it all, COVID has changed and is now making younger Ohioans who are not vaccinated very sick. Don't become a statistic when there is a simple, safe, and effective alternative. **Go out today and get vaccinated**.

Maras Aff., Exh. "H" (emphasis added).

Again, the relevant point is not whether the medical advice provided by the DOH under

the auspices of the Ohio COVID-19 Health Care System is right or wrong.  These decisions

regarding efficacy and safety rely on other governmental sources of guidance, *e.g.*, the Centers

for Disease Control (CDC) and Food and Drug Administration (FDA).   Given such federal

organizations now have political appointees for the first time disregarding the official

recommendations of their own experts and revising definitions to suit unknown needs it is not

surprising state organizations are making mistakes.  Maras Aff. ¶¶ 11, 12.

In contrast to what is currently happening in the United States, however, the top health

advisors of other countries are changing course based on the most recent studies despite the

potential lack of trust this may engender in a government's prior actions or skepticism in future

action.  For example, on October 8, 2021, the Iceland Directorate of Health ruled that the

Moderna vaccine could no longer be used in Iceland until further safety information was

---

[2] Maras Aff. ¶ 61 ("The estimated age-specific [infection fatality rate] is very low for children and younger adults (e.g., 0.002% at age 10 and 0.01% at age 25) but increases progressively to 0.4% at age 55, 1.4% at age 65, 4.6% at age 75, and 15% at age 85.").

obtained. Maras Aff., ¶ 15. *See also* Maras Aff. ¶¶ 55 – 65.

It is also worth pointing out the mandates springing from the Ohio COVID-19 Health Care System are unlike anything ever before seen in this state. The Ohio COVID-19 Health Care System is coercively providing medical advice, treatments, and forcing Ohioans to use medical devices without their consent – and at some point, if left unchecked, will likely mandate usage of the COVID-19 vaccines. This conduct differs from requiring school children obtain actual immunization against communicable diseases. According to the "Ohio **Immunization** Summary for School Attendance", the following **immunization** vaccines are required for school attendance in 2021: Diphtheria, Tetanus, Pertussis, Polio, Measles, Mumps, Rubella, Hepatitis B, Chickenpox, and Meningococcal. Maras Aff. ¶ 16.

Even though an argument can be made even these forced **proven** immunization vaccines are problematic under the Ohio Health Care Amendment, at least mandatory school vaccines **do immunize against associated diseases** – which is why these diseases no longer cause any major problem in the United States. Moreover, school records involving the school vaccines are not stored with temperature readings; mask usage/non-usage statistics; contact tracing data; hospitalization data; or quarantine information all related to the same disease. That cannot be said for the current batch of COVID-19 "vaccines" that are pushed within the Ohio COVID-19 Healthcare System. Indeed, the current steadily increasing number of reported COVID-19 "breakthrough" cases quickly dispels any such immunity myth. Despite what may be stated as "FACT" by the DOH, the long-term efficacy of these COVID-19 vaccines is now clearly in doubt whereas natural immunity is not. Maras Aff. ¶ 10.

Ignoring the Ohio Health Care Amendment and contrary to the longstanding tradition of Ohioans deciding their own health care in consultation with their personal physicians and after doing their own research, Respondent recently ratcheted up the Ohio COVID-19 Health Care System by actively promoting the COVID-19 vaccination **of Ohio's children** by launching on October 8, 2021 a vaccine promotion giving away "a chance to win one of 150 $10,000 scholarships or one of five $100,000 grand-prize scholarships."  *See* Maras Aff. ¶17.

This coercion of Ohio children comes on the heels of the previous Ohio "Vax-a-Million" lottery paid for using federal relief money.  To that end, on May 18, 2021, DOH Director Stephanie McCloud and Ohio Lottery Director Pat McDonald announced,

> **Ohioans 18 and older who have received a received at least one dose of the COVID-19 vaccine can enter to win one of five $1 million prizes. Ohioans ages 12-17 who have received a received at least one dose of the COVID-19 vaccine can enter to win one of five four-year, full-ride scholarships**, including room and board, tuition, and books, to any Ohio state college or university.

Maras Aff., Exh. "I" (emphasis added).  Given that this contest has since concluded the

https://ohiovaxamillion.com website now forwards to the recently launched "Ohio Vax-2-

School" website:



Maras Aff. ¶¶ 17, 18.   Designed to lure children, the "Ohio Vax-2-School" contest is found at:

https://www.ohiovax2school.com.  *Id.*

 The entry form requires that the participant acknowledge they are "explicitly waiving

any privacy rights" and are providing consent "for the Ohio Department of Health to verify

vaccination status with the health care provider stated. . . ."  The name of a child's **pharmacy** is

even obtained during the entry process:

PHARMACY/LOCATION NAME *

LOCATION CITY *

LOCATION STATE *

Ohio

DATE OF FIRST VACCINATION *

Month      Day      2021

YES, I ACCEPT THE OFFICIAL RULES. *

BY ENTERING THIS DRAWING ON BEHALF
OF YOURSELF OR A PERSON (COLLECTIVELY
"INDIVIDUAL") UNDER YOUR
GUARDIANSHIP, YOU ARE STATING THAT
YOU HAVE THE AUTHORITY AND ARE
EXPLICITLY WAIVING ANY PRIVACY RIGHTS
OF THAT INDIVIDUAL AND PROVIDING
PERMISSION FOR THE OHIO DEPARTMENT
OF HEALTH TO VERIFY VACCINATION
STATUS WITH THE HEALTH CARE PROVIDER
STATED AND USE AND SHARE THE WINNERS
NAME AND/OR LIKENESS IN MEDIA
WITHOUT PRIOR CONSENT. *

I'm not a robot

reCAPTCHA
Privacy - Terms

SUBMIT

Maras Aff. ¶ 19.  The page is publicly available at https://www.ohiovax2school.com/UserInfo.aspx.

 The "Eligibility and Verification" rules for Respondent's "promotion" expressly requires

that a participant obtain a vaccination for prize eligibility – there is no other means to enter:

## Eligibility and Verification

You/your child or person under guardianship are eligible to participate in the drawing if you meet all the following requirements:

1. Are a living citizen of the United States and a permanent resident of State of Ohio.
2. Are at least 12 years of age but not older than 25 on the last day of the drawing. Any young Ohioan age 5 to 11, may also be registered by their legal guardian if a COVID-19 vaccination is authorized for use in this age group by the FDA and administered prior to the registration deadline.
3. Are not incarcerated (in prison or jail) for a felony conviction under the laws of this state, another state, or the United States.
4. Is not in the custody of the Department of Youth Services.
5. Is not an employee or Officer of the Ohio Lottery Commission, the Ohio Department of Health or the Ohio Governor's Office, or any blood relative or spouse of such an employee or officer living as a member of the employee's or officer's household.
6. Has received at least your first dose of COVID-19 vaccine if receiving the Pfizer or Moderna vaccine or one dose if receiving the Johnson & Johnson vaccine. Ohioans ages 12 to 25 who participated or are currently participating in a clinical trial for other COVID-19 vaccines are also eligible. Ohioans 5 to 11 who participated in a clinical trial for other COVID-19 vaccines will also be eligible once a COVID-19 vaccination is authorized for use in this age group by the FDA and administered prior to the registration deadline.
7. Has not won a prize in the Ohio Vax-A-Millions drawings.

Maras Aff. ¶ 20. The page is publicly available at https://www.ohiovax2school.com/Rules.aspx.

For many reasons, this government vaccine "promotion" targeting children stands at the apex of why this Complaint is so crucial to Ohioans across the state.

## **ARGUMENT**

### **POINT I**
### **RELATOR'S COMPLAINT SEEKS TO COMPEL RESPONDENT TO DISMANTLE ALL ASPECTS OF THE OHIO COVID-19 HEALTH CARE SYSTEM VIOLATIVE OF ARTICLE I, SECTION 21 OF THE OHIO CONSTITUTION**

Article IV, Section 2(B)(1) of the Ohio Constitution states that this Court shall have original jurisdiction in mandamus actions.  Mandamus has been specifically defined as "a writ, issued in the name of the state to an inferior tribunal, a corporation, board, or person, **commanding the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station**."  Ohio Rev. Code § 2731.01 (emphasis added).  Subject matter jurisdiction exists here under Civ. R. 12(B)(1) given a "cause of action cognizable by the forum has been raised by the complaint."  *State ex rel. Bush v. Spurlock* (1989), 42 Ohio St.3d 77,80,

537 N.E.2d 641.

Article IV, Section 2(B)(3) of the Ohio Constitution precludes any law or rule from preventing a person "from invoking the original jurisdiction of the supreme court." Ohio Constitution, Article IV, Section 2(B)(3). This language was proposed by the 1912 Constitutional Convention and was adopted by the Ohio electorate, effective January 1, 1913. *State ex rel. Pressley v. Indus. Comm*. (1967), 11 Ohio St.2d 141, 145, 228 N.E.2d 631. Prior to this 1913 Amendment, "the Supreme Court had the discretion to decline to exercise its original jurisdiction over extraordinary writs." *See Hughes v. Scaffide*, (1978), 53 Ohio St.2d 85, 88-89, 372 N.E.2d 598.

Parties seeking to file a mandamus action in the Supreme Court were previously required to seek leave to file. *State ex rel. Toledo v. Lynch* (1913), 87 Ohio St. 444, 445-446, 101 N.E. 352 (application for leave to file mandamus action "is consonant with a practice long since established and consistently adhered to in this court to require leave to file petitions invoking the exercise of its original jurisdiction upon any of the subjects within that jurisdiction").

By way of this Complaint brought under original jurisdiction, Relator now comes before this Court seeking a mandatory injunction to remedy past injuries caused by Respondent's disregard of a "plain on its face" constitutional provision. Article I, Section 21 of the Ohio Constitution reads in part:

> **Preservation of the freedom to choose health care** and health care coverage
>
> §21 (A) **No federal, state, or local law or rule shall compel, directly or indirectly, any person**, employer, or health care provider **to participate in a health care system**. . . .

> (E) As used in this Section. . .  (2)  **"Health care system"
> means  any public or private entity or program whose
> function or purpose includes the management of,
> processing of, enrollment of individuals for**, or payment
> for,  **in  full  or  in  part,  health  care  services,  health  care
> data, or health care information for its participants**.

Ohio Constitution Article I, Section 21 (emphasis added).[3]

The Ohio Health Care Amendment was placed on the November 8, 2011 ballot as an

initiated constitutional amendment and passed with over 65% of the vote.   Maras Aff. ¶ 22.

Even though the measure was initially launched in response to former President Barack

---

[3] Read in its entirety:

Preservation of the freedom to choose health care and health care coverage

§21 (A) No federal, state, or local law or rule shall compel, directly or indirectly, any person,
employer, or health care provider to participate in a health care system.

(B) No federal, state, or local law or rule shall prohibit the purchase or sale of health care or
health insurance.

(C) No federal, state, or local law or rule shall impose a penalty or fine for the sale or purchase of
health care or health insurance.

(D) This section does not affect laws or rules in effect as of March 19, 2010; affect which services
a health care provider or hospital is required to perform or provide; affect terms and conditions
of government employment; or affect any laws calculated to deter fraud or punish wrongdoing
in the health care industry.

(E) As used in this Section,

(1) "Compel" includes the levying of penalties or fines.

(2) "Health care system" means any public or private entity or program whose function or
purpose includes the management of, processing of, enrollment of individuals for, or payment
for, in full or in part, health care services, health care data, or health care information for its
participants.

(3) "Penalty or fine" means any civil or criminal penalty or fine, tax, salary or wage withholding
or surcharge or any named fee established by law or rule by a government established, created,
or controlled agency that is used to punish or discourage the exercise of rights protected under
this section.

Ohio Constitution Article I, Section 21

Obama's signing of a 2010 national health care mandate law, the amendment's final language comfortably serves today as a constitutional safeguard against the conduct of Respondent. The Official Explanatory Statement for this successful ballot initiative states the Ohio Health Care Amendment was explicitly initiated to "preserve the freedom of Ohioans to choose their health care." Maras Aff. ¶23; Maras Aff., Exh. "J".

The Official Explanatory Statement in favor of this successful ballot initiative begins: "Protect your health care freedom, preserve your right to choose your doctor and health insurance, **and keep government out of your personal medical decisions**." *Id*. (emphasis added). As well, according to this same Official Explanatory Statement, if this Constitutional Initiative does not pass, "government can . . . Force you to disclose private medical information [and] Prohibit you from obtaining private medical treatment." *Id*.

In other words, Ohioans voted for the Ohio Health Care Amendment as a means of preventing the Ohio COVID-19 Health Care System from ever coming into existence.

### 1. The Complaint seeks a mandatory injunction that is well taken in this Court

Respondent curiously argues that this Court allegedly "lacks subject-matter jurisdiction over the Complaint" given that while "styled as a mandamus action, Relator actually seeks prohibitory injunctions, apparently to stop all COVID-19-related recommendations or requirements in the State of Ohio, as well as to direct Respondent to follow the Ohio Constitution in the future." Respondent Brief at 1.

Relator does not waste this Court's time to complain about mere recommendations even though such recommendations are demonstrably wrongheaded. History has a funny way of unraveling the truth and will at some point in time confirm deep flaws in the many medical

recommendations of Respondent/DOH.  This action is not looking to speed up that process and suggests that nature take its course.  For example, rather than requiring people stay indoors and wear masks outdoors, did it make more sense to suggest Ohioans increase their Vitamin D levels and go outside without a mask?  There is certainly strong evidence that sunlight-produced Vitamin D found in our skin provides some levels of immune protection against COVID-19 yet the prevailing means to combat the virus was to immediately close businesses and suggest people stay indoors for many months afterwards.  Maras Aff. ¶ 24.

Relator does not care whether history is kind to those in power, and only now seeks compliance with Article I, Section 21 of the Ohio Constitution by compelling Respondent to remove all vestiges of the unconstitutional Ohio COVID-19 Health Care System that to this day remains under Respondent's full control.  It almost goes without saying, Relator does not seek prohibitory injunctions.   In keeping with accepted practice, Relator seeks a mandatory injunction to compel the dismantling of the Ohio COVID-19 Health Care System given injuries already sustained from the creation of Respondent's governmental program.  *See State ex rel. Gen. Motors Corp. v. Indus. Comm*. (2008), 117 Ohio St.3d 480, 482, 884 N.E.2d 1075 ("Because a complaint that seeks to prevent, rather than compel, an action is not proper for mandamus, we must ascertain the substance of GMC's complaint and its aims. [citation omitted] GMC seeks a writ directing the commission to vacate its order and to properly credit GMC for all the sums it has paid for and on behalf of Stephan, in the form of the withheld taxes, in calculating the amount still owed to Stephan. The complaint, therefore, seeks to compel the commission to take an affirmative action.") (allowing the issuance of a Writ of Mandamus given the mandatory injunction in question "compels the defendant **to restore a party's rights through an**

affirmative action") (emphasis added);  *State ex rel. Fenske v. McGovern* (1984), 11 Ohio St.3d

129, 131, 464 N.E.2d 525 ("Here, assuming relator otherwise demonstrates a clear legal right to

the requested writ, declaratory judgment would not be a complete remedy, unless coupled

with **ancillary relief in the nature of mandatory injunction since relator seeks to compel**

**respondents auditor and treasurer to perform a specific act incumbent upon their offices**.")

(emphasis added) (reversing dismissal of writ of mandamus); *State ex rel. Smith v. Indus. Comm.*

(1942), 139 Ohio St. 303, 306, 39 N.E.2d 838 ("The functions of an injunction are ordinarily to

restrain motion and enforce inaction, while those of mandamus are to set in motion and to

compel action").

Indeed, if Respondent simply misinterpreted the Ohio Health Care Amendment, a writ

of mandamus would still be appropriate.  *State ex rel. Gassmann v. Indus. Comm.* (1975), 41

Ohio St.2d 64, 65, 322 N.E.2d 660 ("A mandatory writ may issue against the Industrial

Commission if the commission has incorrectly interpreted Ohio law"); *Sullivan v. State ex rel.*

*O'Connor* (1932), 125 Ohio St. 387, 392, 181 N.E. 805 (flagrant misinterpretation of statute by a

county board of elections is reviewable through an action in mandamus).

Relator also does not care whether the "Ohio Vax-2-School" promotion may have

elements of an invalid sweepstakes or an invalid lottery improperly targeting minors – which is

perhaps why the entire affair was given gravitas by having the Ohio Lottery Director involved in

the "Ohio Vax-a-Million" launch.  *See* Ohio Rev. Code § 2915.01(BBB) ("Sweepstakes" means

any game, contest, advertising scheme or plan, or other promotion **where consideration is not**

**required for a person to enter to win or become eligible to receive any prize**, the

determination of which is based upon chance.") (emphasis added); Ohio Admin. Code § 109:9-

1-01(A) ("Each person that desires to conduct a sweepstakes shall submit an application for registration with the attorney general. Such application shall be on forms provided by the attorney general."); Ohio Rev. Code § 3770.08(B), (C) ("No person other than a licensed lottery sales agent shall sell lottery tickets. . . . No person shall sell a lottery ticket to any person under eighteen years of age, and no person under eighteen years of age shall attempt to purchase a lottery ticket.").

The only pertinent matter for purposes of this action is that this heavily promoted contest requires entry into the unlawful Ohio COVID-19 Health Care System – this time now actively soliciting the participation of children.[4]  Again, it does not matter whether Respondent's sweepstake improperly lures kids into taking a vaccine with adverse reactions and diminishing efficacy all to stop a virus with a near zero chance of harming them – what matters for purposes of this action is that such conduct furthers the receipt of personal healthcare data brought into the Ohio COVID-19 Health Care System.

As part of the Ohio COVID-19 Health Care System, Respondent actively encourages others to violate the Ohio Health Care Amendment – thereby curtailing Ohioans' constitutional right to the "preservation of the freedom to choose health care."  For example, on September 17, 2021, Respondent issued the following press release:

> Ohio Governor Mike DeWine today announced that nearly 58% of Ohio's public K-12 students are required by their local school to wear masks in schools. On September 1st only 35% of Ohio students were required to wear a mask.

---

[4] The fact that this vaccine promotion purportedly requires online approval of a guardian does not diminish how it specifically targets children – who can themselves complete the online form given no credit card information is required.  Maras Aff. ¶ 17.

"**I am pleased to see more school superintendents and school boards make the right decision and require masks to protect students and teachers from COVID-19 spread**," said Governor DeWine. "**We share a common goal** of ensuring kids are in school, in person, five days a week. While **vaccinations remain the best protection** against severe COVID-19 cases, **masking will help protect those** that can't yet receive the vaccine and adds another layer of protection for those that have."

The **mask policies are working to limit the spread**. In Ohio school districts where masks are optional, **case rates are higher than in districts that require some masking**, and we see **better week-to-week trends in schools where everyone wears a mask**. Most importantly, there have been **fewer quarantines in schools where everyone wears a mask**, helping us towards meeting the goal of keeping Ohio children in the classroom.

Maras Aff., Exh. "H" (emphasis added). *Compare with* Maras Aff., Exh. "K"; Maras Aff. ¶¶ 27 - 29.

Despite the fact state-wide mask mandates were rescinded on June 2, 2021,[5] school

mask mandates are now actively encouraged by Respondent and stand as local rules in

furtherance of the unconstitutional Ohio COVID-19 Health Care System. Ohio school boards are

promulgating local rules that compel students participate in a health care system, namely a

"program whose function or purpose includes the management of, processing of . . . health

care services, health care data, or health care information for its participants." Ohio

Constitution, Article I, Section 1. By actively promoting the use of these mask mandates,

---

[5] Before being rescinded effective June 2, 2021, the DOH Director's mask mandate, "Second Amended Order for Social Distancing, Facial Coverings and Non-Congregating", dated May 17, 2021, required: "Except as provided herein, all individuals that are not fully vaccinated in the State of Ohio shall wear facial coverings at all times when: i. In any indoor location that is not a residence; ii. Outdoors and unable to consistently maintain a distance of six feet or more from individuals who are not members of their family/household; or iii. Waiting for, riding, driving, or operating public transportation, a taxi, car service, or a ride sharing vehicle. This does not apply to private or rental vehicles where members of a family/household are sharing a vehicle." Maras Aff., Exh. "C"

Respondent is indirectly compelling Ohioans to participate in the Ohio COVID-19 Health Care System using **local school board rules**.  Interestingly, Respondent complains:  "Relator claims that '[c]itizens were required to wear alleged medical devices,' but does not specify who required this, which citizens are in question, what 'medical devices' encompasses, or what act, order, guidance, or law Relator is challenging."  Respondent Brief at 6.

Every school board egged on by Respondent is the "who required this"; 3-ply surgical masks are the "medical devices" in question; and all "acts, orders, guidance" issued by Respondent that furthered such unlawful conduct is what Relator "challenges" by way of this Complaint.  By way of background, Section 201(h) of the Federal Food, Drug, and Cosmetic Act states that a medical device is "any instrument, machine, contrivance, implant, in vitro reagent that's intended to treat, cure, prevent, mitigate, diagnose disease in man or other animals."  21 U.S.C. § 321(h).   Given the sort of 3-ply surgical masks required by schools are used to prevent a disease, they are being used as medical devices.

In fact, the FDA categorizes commonly used 3-ply surgical masks as a "Class 2" medical device.  Maras Aff., Exh. "L".  And, this FDA designation is recognized by the Occupational Safety and Health Administration:  "Surgical masks are typically cleared by the U.S. Food and Drug Administration as medical devices and are used to protect workers against splashes and sprays (*i.e.*, droplets) containing potentially infectious materials."   Maras Aff. ¶ 33.

Unlike with a standard medical device, proof of efficacy to mitigate disease was likely never determined by any Ohio School Board before issuing mask mandates.  It is almost superfluous that the most current research – research completely disregarded by the Ohio COVID-19 Health Care System, demonstrates that masks **are neither effective nor safe for long**

-21-

**term usage** or that there are much better options to stop the transmission of SARS-CoV-2.  *See* Maras Aff. ¶¶ 34 – 52.   As with the COVID-19 vaccines, this action is not concerned with demonstrating the lack of safety or efficacy in masks or the improper mandated use of medical devices despite the near complete lack of risk to children exposed to SARS-CoV-2 – this Complaint only seeks removal of the Ohio COVID-19 Health Care System given its clear flouting of a constitutional amendment.

Given that all unconstitutional acts undertaken by Respondent, DOH, and other state, local and private actors are too voluminous to fit within the confines of a single brief or affidavit, it is respectfully requested that if this Court determines this Complaint is well taken that it also exercises its discretion and appoint a master commissioner.  Such master commissioner would carefully evaluate the evidence and recommend which applicable actions constituting the Ohio COVID-19 Health Care System must be rescinded pursuant to the ruling of this Court.  *See* S. Ct. Prac. R. 12.10.

    **2.  No other venue would provide Relator with an adequate remedy given none could provide "complete, beneficial, and speedy" relief**

Respondent suggests that Relator start from scratch given, "Relator has an adequate remedy at law for the entire Complaint in the form of a declaratory judgment and prohibitory injunctions."  *See* Respondent Brief at 8.   Perhaps Respondent seeks to neutralize application of the "public interest doctrine" discussed below in Point II – a doctrine pertaining to standing that is **only available in mandamus actions**.  In any event, nothing could be further from the truth.  There is no better jurisdictional venue than the Supreme Court of Ohio sitting in original jurisdiction on a matter brought against the Governor of Ohio involving the violation of

constitutional rights impacting every Ohioan's health and well-being.

Respondent also ignores that an alternate "adequate remedy" must provide "complete, beneficial, and speedy" relief. *State ex rel. Smith v. Cuyahoga Cty. Court of Common Pleas* (2005), 106 Ohio St. 3d 151, 155, 832 N.E.2d 1206 (recognizing that an "extraordinary writ is appropriate when the alternate remedy is not complete, beneficial, and speedy."). There can be no speedier route than having this Court address Respondent's conduct given layers of appeal are immediately removed. As to whether "complete" relief could be derived with a new filing in a common pleas court, it is unclear how that is possible given what is at stake here. Respondent's apparent strategy is to delay – with the hope that the current constitutional crisis dissipates by the time appeals are filed and heard. Respectfully, such tactics run counter to longstanding Supreme Court authority and would neither be "complete" nor "beneficial".

For example, in *State, ex rel. Liberty Mills, Inc.*, this Court held that an applicant for an agricultural commodity handler's license did not have an adequate remedy via appeal because harvest season would pass by the time the appeal was concluded. *State, ex rel. Liberty Mills, Inc., v. Locker* (1986), 22 Ohio St. 3d 102, 488 N.E. 2d 883. Ohioans will die today and years from now **as a direct result of the medical treatments compelled and promoted by way of the Ohio COVID-19 Health Care System** – a delay here will impact lives and not vegetables.

In *State, ex rel. Butler*, this Court held that an appeal from the denial of a litigant's choice of attorney was not an adequate remedy because waiting for an appeal would force both the litigation and appeal to be undertaken without counsel of choice. *State, ex rel. Butler, v. Demis* (1981), 66 Ohio St. 2d 123, 420 N.E. 2d 116. And, in *State, ex rel. Ohio State Racing Comm.*, this Court determined that an appeal would be neither a complete remedy nor speedy

given the tax abatements in question were granted daily, for each day racing is conducted at a track and if tax abatement were enjoined during the trial of the case, relators could suffer loss of the abatements.  And, to "have to try the case twice and then to have to resort to an additional remedy negate the adequacy of appeal."  *State, ex rel. Ohio State Racing Comm., v. Walton* (1988), 37 Ohio St. 3d 246, 248, 525 N.E. 2d 756, 758.

An entire healthcare system created by Respondent in violation of Article I, Section 21 provides medical advice every day to thousands of Ohioans while coercing and advocating for the use of unhealthy medical devices.  Waiting for several appeals to be heard when such constitutional violations already create original jurisdiction in this Court goes against the spirit of those changes made in the 1912 Constitution safeguarding this Court's original jurisdiction in mandamus actions.

This Complaint should respectfully remain where it was filed given that Relator can only ensure "complete, beneficial, and speedy" relief in this Court as against the conduct emanating from the Executive Branch.  For Respondent's counsel – the Attorney General of the State of Ohio, to suggest otherwise ignores the obvious.

This Court stands as the best and loudest possible check on the Ohio COVID-19 Health Care System.  Chief Justice Huntington wrote in 1807 that "our constitution is the supreme law of the land, and paramount to any legislative act," that "the judiciary [is] a co-ordinate branch of the government deriving its authority from the constitution," and that **"[t]he people can never be secure under any form of government, where there is no check among the several departments**." *State ex rel. Ohio Acad. of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451,

463, 715 N.E.2d 1062 (emphasis added) (*quoting Rutherford v. M'Faddon* (1807), Pollack, Ohio

Unreported Judicial Decisions Prior To 1823 (1952) at 73, 74, 75).

    This final check applies equally in good times and in bad. **As anticipated by our**

**Founders**, the Constitution can easily be disregarded during a crisis. *See State v. Smith* (1989),

45 Ohio St. 3d 255, 269, 544 N.E.2d 239 (WRIGHT, J., dissenting) ("Those great and good men

foresaw that troublous times would arise, when rulers and people would become restive under

restraint, **and seek by sharp and decisive measures to accomplish ends deemed just and**

**proper**; and that the principles of constitutional liberty would be in peril, unless established by

irrepealable law. The history of the world had taught them that what was done in the past

might be attempted in the future. **The Constitution of the United States is a law for rulers and**

**people, equally in war and in peace, and covers with the shield of its protection all classes of**

**men, at all times, and under all circumstances**.") (emphasis in original) (*quoting Ex parte*

*Milligan* (1886), 71 U.S. (4 Wall.) 2, 121 – 122).

**POINT II**
**RELATOR AND THE MANY OHIOANS WHO TOOK THE**
**TIME TO FILE AFFIDAVITS IN SUPPORT OF THIS PUBLIC**
**COMPLAINT HAVE A REAL INTEREST IN THIS MATTER**
**AND ADEQUATE STANDING**

    Respondent suggests there is no standing for the Complaint given that Relator provides

"no factual allegations of specific injuries Relator has suffered. Without her own concrete

injury, Relator's case cannot stand." Respondent's Brief at 1. According to Respondent:

"Traditional standing principles require litigants to show, at a minimum, that they have suffered

'(1) an injury that is (2) fairly traceable to **the defendant's** allegedly unlawful conduct, and (3)

likely to be redressed by the requested relief.'" Respondent's Brief at 3 – 4 (emphasis added)

(citations omitted).    And finally, Respondent suggests that "even if Relator amended her

Complaint to include specific harms she has allegedly suffered, she would still lack standing

because the general harms she is targeting in this lawsuit **are not 'different from the concerns**

**shared by the general public'**- which the concrete-injury prong requires. [citation omitted].

The harms Relator's Complaint asserts **are alleged harms to 'the people of Ohio.'**"

Respondent's Brief at 4 (emphasis added).

## 1.  Standing in this action arises under the public-right doctrine

Respondent cites inapplicable caselaw regarding common-law standing while ignoring

the applicable standard as regards Complaints seeking writs of mandamus – **despite citing a**

**case directly on point regarding this standard**.  *Compare* Respondent's Brief 3 - 4 (*citing*

*ProgressOhio.org, Inc. v. JobsOhio* (2014), 139 Ohio St.3d 520, 13 N.E.3d 1101) *with*

*ProgressOhio.org, Inc. v. JobsOhio* (2014), 139 Ohio St.3d 520, 522, 13 N.E.3d 1101 ("The public-

right doctrine represents 'an exception to the personal-injury requirement of standing'. . .

Appellants do not have standing under the public-right doctrine.  As *Sheward* makes clear, **the**

**public-right doctrine applies only to original actions in mandamus** and/or prohibition. . . . It

does not apply to declaratory-judgment actions filed in common pleas courts, and we have

never used the doctrine in such a case.") (emphasis added) (citation omitted).

As cited by Respondent, the Complaint – despite the inartful manner, references the

correct standard.  *See* Respondent's Brief at 1 (*quoting* Complaint, ¶ 9) ("Several federal

entities, state entities both private and public have been VIOLATING the civil liberties of the

people of Ohio for a period that is too great to determine.").  This Court has recognized that it is

"free to dispense with the requirement for injury where the public interest so demands."  *State*

*ex rel. Ohio Acad. of Trial Lawyers*, *supra*, 86 Ohio St.3d at 470.  "This court has long taken the position that when the issues sought to be litigated are of great importance and interest to the public, they may be resolved in a form of action that involves no rights or obligations peculiar to named parties." *Id*. at 471.  *See also State ex rel. Meyer v. Henderson* (1883), 38 Ohio St. 644, 648 – 649 ("As regards the degree of interest on the part of the relator, requisite to make him a proper party on whose information the proceedings may be instituted, **a distinction is taken between cases where the extraordinary aid of a mandamus is invoked, merely for the purpose of enforcing or protecting a private right, unconnected with the public interest, and those cases where the purpose of the application is the enforcement of a purely public right**, where the people at large are the real party in interest, and, while the authorities are somewhat conflicting, yet the decided weight of authority supports the proposition that, where the relief is sought merely for the protection of private rights, the relator must show some personal or special interest in the subject matter, since he is regarded as the real party in interest and his rights must clearly appear. **On the other hand, where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the people are regarded as the real party, and the relator need not show that he has any legal or special interest in the result, it being sufficient to show that he is a citizen, and, as such, interested in the execution of the laws**.") (emphasis added); *State ex rel. Clark v. Johnson* (1995) 120 N.M. 562, 578 ("Petitioners assert in the present proceeding that the Governor has exercised the state legislature's authority. Their assertion presents issues of constitutional and fundamental importance; in resolving those issues, we will contribute to this State's definition of itself as sovereign. "**We simply elect to confer standing on the basis of the importance of**

the public issues involved." **More limited notions of standing are not acceptable**. . . . The final

procedural issue is whether mandamus, which normally lies to compel a government official to

perform a non-discretionary act, is a proper remedy by which to enjoin the Governor from

acting unconstitutionally. **This Court has never "insisted upon . . . a technical approach [to the**

**application of mandamus] where there is involved a question of great public import," and**

**where other remedies might be inadequate to address that question**. . . . Although it is not

within the province of this Court to evaluate the wisdom of an act of either the legislature or

the Governor, **it certainly is our role to determine whether that act goes beyond the bounds**

**established by our state Constitution**.") (citations omitted) (emphasis added) (New Mexico's

highest court ruling its Governor lacked authority to enter into various tribal-state gaming

compacts and voiding same).

  This Complaint compels the Governor to act in compliance with a clear Constitutional

mandate impacting all Ohioans.  There is no more important expression of a public right than

one in which the judiciary ends the unconstitutional actions of a Governor that are directly in

contravention of the health care rights of all Ohioans.   It is one thing to issue harsh bandwagon

health mandates to stop a virus with an acknowledged 99% survival rate in most of the Ohio

population.  It is quite another thing to do so despite an existing constitutional bar against the

implementation of this massive government-run health care system.  Under such

circumstances, the public-right doctrine fits squarely to provide standing in this matter.

   **2.  Standing in this action also arises given the concrete injuries**
    **sustained by Relator and Affiants**

  It is unclear why the many affidavits filed with this Complaint were wholly ignored by

Respondent.  They were always part of this action.  *See c.f.*, S. Ct. Prac. R. 12.02(B)(1) ("All

complaints shall contain a specific statement of facts upon which the claim for relief is based, **shall be supported by an affidavit specifying the details of the claim**, and may be accompanied by a memorandum in support of the writ.") (emphasis added).  Instead, Respondent questions the value of Relator's Exhibit "Q".  *See* Respondent's Brief at 5, n. 1 ("Exhibit Q, referenced in Relator's Complaint, also fails to identify any specific action or inaction of Respondent that Relator alleges to be unlawful.  *See* Exh. Q (containing webpages allegedly from the City of Dayton, Ohio University, the Ohio Department of Health, and the City of Marysville).").

Exhibit "Q" provides documentation of the Ohio COVID-19 Health Care System.  *See* Exhibit "Q", filed September 10, 2021 (DOH COVID-19 Contact Tracing ("If you test positive for COVID-19, your healthcare provider will call you to let you know that you tested positive. They will notify the local health department, who will then notify the Ohio Department of Health so that the case is added to the state's data. During this time, you continue to stay home and isolate yourself.  Next, a public health worker who is performing contact tracing will reach out to you to voluntarily talk and create a line list that is made up of who you have been in contact with. This traces who you may have come into contact with and may have been exposed to the virus."); DOH COVID-19 Dashboard ("The COVID-19 Vaccination Dashboard displays the most recent data reported to the Ohio Department of Health (ODH) regarding the number of individuals that have started and completed the COVID-19 vaccination series by various demographics and county of residence. "Vaccination started" indicates that the individual has received at least one valid dose of COVID-19 vaccine. The number listed as "vaccination completed" is a subset of the number included in "vaccination started," indicating that those individuals within that group have received all recommended COVID-19 vaccine doses and are

considered fully immunized. ODH is making COVID-19 data available for public review while also protecting privacy. This dashboard will be updated daily."); Dayton, Ohio New Flash, August 3, 2021 ("Visitors to all City of Dayton facilities are required to wear protective facial coverings (masks) as a COVID-19 precaution."); Ohio University COVID-19 Vaccination Requirement ("Ohio University requires that every student, faculty, and student be vaccinated against COVID-19."); The City of Marysville - Temporary Policy ("Official City related travel is only authorized for those that are fully vaccinated (including CDC recommended post vaccination wait period).")

It is important to note that Relator's unorthodox use of the "Q" designation for her exhibit is a signifier for free speech and is not intended to reflect an association with any group. Relator is a single mother with two daughters who by way of her daily podcast has helped others understand they have real power to effectuate change – all that is necessary is for them to start using their pens.  Maras Aff. ¶ 53 - 54.

The following April 16, 2021 response provided by Relator to a New York Times reporter describes her intentions here:

> There are a number of QAnon believers on Twitch; do you consider yourself among them? I know you at one point displayed the logo of your stream with a fiery "Q" instead of the "O" in your name.
>
> Not sure what you mean by "QAnon believer".  Are you saying QAnon can be seen as a religion – which makes your question very intrusive?   I am not ashamed of my actual faith, and I identify as an Orthodox Christian. Having said that, do you think "QAnon believers" should be punished?  Who decides which belief system is acceptable and which is not? **Using "Q" doesn't make me an actual "QAnon believer" – only a supporter of someone's right of free speech.**

> \*\*\*\*\*\*\*
>
> Thank you for the opportunity to respond to your questions and good luck with your article – **which hopefully is about people across the country now getting back into the driver's seat when it comes to running this country**.

Maras Aff., Exh. "N" (Email to Kellen Browning of the New York Times, dated April 16, 2021) (emphasis added).

Affidavits ignored by Respondent include those who will lose their jobs if they do not get a COVID-19 vaccine, *e.g.*, Johanna Forbes, Rachel Freier, Holly Clevenger, Cynthia, Orf, Jessica Burke, James Case, Theresa Lent, Isaac Allison, and Angela Allison.   Others were denied entry to cultural events, *e.g.*, Clara Shurmer, doctor's appointments, *e.g.*, Edward Knicely, and grocery stores, *e.g.*, Nicholas Tsengas.  As Gerald Hecker puts it:  "I have been compelled by state entities both public and private to wear an alleged medical device and sometimes subjected to temperature checks to enjoy freedoms such as taking my son to school, going to doctor appointments, or participating in commerce."  Gina Davidson explains how invasive contact tracing is under the Ohio COVID-19 Health Care System:  "My daughter was diagnosed with COVID in Feb. 2021 and received 5 different quarantine orders:  from the CVS where she took the test, the school, her doctor, a contact tracer, and the local Health Dept."  *See* Maras Aff., Exh. "Q" (spreadsheet providing details regarding **70 affidavits filed in this action** as well as how to easily locate them in the filings); Maras Aff. ¶¶ 65 – 68.

These injuries were directly caused by the unconstitutional Ohio COVID-19 Health Care System, including by way of employers and schools ignoring the Ohio Health Care Amendment while citing DOH "guidelines" as justification for instituting mask and COVID-19 vaccine mandates.  All these private actors also forward improperly obtained personal data to the DOH

for use in the Ohio COVID-19 Health Care System.  If the Ohio government encourages specific

behavior, Ohioans can only presume that such behavior withstands constitutional scrutiny,

especially given the state's chief executive is sworn to uphold the Ohio Constitution.  It is now

incumbent on Respondent to remedy this situation by dismantling the Ohio COVID-19 Health

Care System.

### 3. Standing in this action also arises given the violations in question impact constitutional rights

As recognized by the Court of Appeals for the Sixth Circuit when addressing a college's

COVID-19 vaccine mandate, the alleged violation of a constitutional right *ipse dixit* satisfies the

harm requirement given such allegation of harm goes so far as to demonstrate "irreparable

harm".  *Dahl v. Bd. of Trs. of W. Mich. Univ.*, No. 21-2945, Slip Op. * at 10 (6th Cir. October 7,

2021) ("Enforcement of the University's [COVID-19 vaccine mandate] policy likely would

deprive plaintiffs of their First Amendment rights, an irreparable injury. . . . Proper application

of the Constitution, moreover, serves the public interest, as "it is always in the public interest to

prevent the violation of a party's constitutional rights".  On balance, plaintiffs' strong likelihood

of success on their free exercise claim carries the day.") (citations omitted).  *See also Elrod v.

Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment

freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.");

*Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (recognizing that if "a constitutional right is

being threatened or impaired, a finding of irreparable injury is mandated.");  *G & V Lounge, Inc.

v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (recognizing that "it is

always in the public interest to prevent the violation of a party's constitutional rights.").

Whether this Court applies the public-interest doctrine applicable to mandamus actions, the common-law standard requiring concrete harm, or the automatic harm presumed when a constitutional right is threatened or impaired, Relator has sufficiently asserted standing in each instance and deserves that this Complaint be heard.

### POINT III
### RELATOR SEEKS A MANDATORY INJUNCTION APPLYING ARTICLE I, SECTION 21 OF THE OHIO CONSTITUTION TO DISMANTLE THE OHIO COVID-19 HEALTH CARE SYSTEM

According to Respondent: "Relator does not request any available remedies for alleged past violations of law.  Thus, mandamus is not the proper vehicle, and this Court does not have jurisdiction to consider Relator's claims."  Respondent Brief at 3.   In support of this argument, Respondent cites caselaw for the proposition that mandamus is inappropriate when a relator attempts "to prevent an injury that has not yet occurred".  *Id*. (citation omitted).  Respondent apparently suggests that Relator is merely seeking an advisory opinion about future conduct and that "a writ of mandamus will not issue to compel the general observance of laws in the future."  *Id*.   Relator is neither seeking an advisory opinion from this Court nor the implementation of any prophylactic remedy – Relator seeks the immediate dismantling of an illegal program.

#### 1. Respondent will exercise full executive discretion when dismantling the Ohio COVID-19 Health Care System

Relator does not request that Respondent perform the dismantling of the Ohio COVID-19 Health Care System in any specific manner – only that the current Ohio COVID-19 Health Care System be removed as required by the Ohio Health Care Amendment.  Respondent's decisions regarding how this dismantling should take place is strictly left to Respondent's

discretion.  Should this Court consider Relator's Complaint well taken and refer this matter to a

master commissioner, such person will only determine the exact parameters of the Ohio

COVID-19 Health Care System that must be dismantled but not how it should be dismantled.

The Ohio Health Care Amendment is a necessary wet blanket that can be placed over

the fire long raging in the form of the Ohio COVID-19 Health Care System, a program which now

urgently requires dousing and dismantling.

Relator does not request this Court issue any broad writ ordering Respondent to adhere

to the Ohio Health Care Amendment.   She and fellow Ohioans seek to remedy past conduct by

having the current Ohio COVID-19 Health Care System dismantled in a manner left to the

discretion of Respondent.  This Court can decide on another day with another Relator what

should be done if Respondent chooses a similar course of action during another future health

crisis.  Relator presumes Respondent will in the future adhere to all provisions of the Ohio

Constitution – including the Ohio Health Care Amendment, and that this transgression was an

aberration born out of unique circumstances.

Relator respectfully requests that this Court provide the same sort of relief provided

many times before.  *See State ex rel. Husted v. Brunner* (2009), 123 Ohio St.3d 119, 123, 914

N.E.2d 397 (2009) ("Accordingly, we grant Husted a peremptory writ of mandamus compelling

the secretary of state to comply with her duty under R.C. 3501.11(X) to break the elections

board's tie vote and summarily decide the issue of Husted's residency no later than seven days

from the date of this opinion. **We dismiss Husted's remaining claims, which attempt to control**

**the secretary's discretion in making that decision**.") (emphasis added); *State ex rel. Gen.*

*Motors Corp., supra,* 117 Ohio St.3d at 482 ("A mandamus action is thus appropriate where

there is a legal basis to compel a public entity to perform its duties under the law. Likewise, **a writ of mandamus may lie if the public entity has abused its discretion in carrying out its duties. In addition, if the public entity has misinterpreted a statute, a writ of mandamus may be an available remedy**.") (emphasis added) (citations omitted); *State ex rel. Hodges v. Taft* (1992), 64 Ohio St.3d 1, 4, 591 N.E.2d 1186 ("A writ cannot issue to control an officer's exercise of discretion, but **it can be issued to compel him to exercise it when he has a clear legal duty to do so**.") (emphasis added); *State, ex rel. Scott, v. Masterson* (1962), 173 Ohio St. 402, 183 N. E. 2d 376 ("The basic purpose of the writ of mandamus is to compel a public officer to perform the duties imposed upon him by law, and, **even though such duties involve the use of discretion, a court, although it cannot control such discretion, may compel the exercise of such discretion**.") (emphasis added). *See also O'Neil v. Thomson*, 114 N.H. 155, 159 (1974) ("Even though part of Executive Order No. 73-14 has been revoked we hold that the petition should not be dismissed for mootness as we believe justice requires that the matters in issue be decided so that all officials concerned 'may know where they stand'.") (citation omitted) (invalidating Executive Orders issued by New Hampshire Governor).

Relator cannot say it enough times: She seeks the dismantling of an unlawful program – how Respondent goes about accomplishing this task is left to his discretion, as it should be given his role as chief executive of Ohio and the proper deference that office should be accorded.

### 2. Article I, Section 21 of the Ohio Constitution does not need legislative assistance for its interpretation or enforcement

Respondent also moves to dismiss alleging: "None of her allegations state a cognizable mandamus claim because Article I, Section 21 of the Ohio Constitution provides no clear legal

right – and imposes on Respondent no clear legal duty – to enjoin health-related recommendations or requirements." Respondent's Brief at 1.  As stated above, this Complaint is not driven by improper "recommendations".   Moreover, there is little case law interpreting the Ohio Health Care Amendment and certainly none involving the issues pertaining to the Complaint or would create any "clear legal rights".  Such facts standing alone, however, neither further nor takes away from Relator's Complaint.

It is worth pointing out that Respondent cannot be faulted for following the lead of federal officials and issuing health care orders based on their recommendations.  Most states did the same thing.  What is different in Ohio from most states, however, is that the underlying healthcare infrastructure deployed to enforce such mandates is constitutionally barred.

If vaccines and masks do not effectively stop infection and transmission for all citizens, then even if they provide some level of health benefit with certain segments of the population, they should **never be mandated or monitored** in the same way forced weight loss, regular exercise or teetotaling should never be mandated or monitored.   By promoting a health care system that tracks health data and actively promotes ineffective and potentially harmful vaccines and masks within that tracking system, Respondent not only violates the Ohio Constitution – such activities also endanger the health and welfare of Ohioans.  This Court respectfully must right our ship no matter how much pressure has been deployed against common sense reasoning and constitutional rights.

Respondent also implies the Ohio Health Care Amendment only references aspirational ideals and is not "self-executing" so further legislative action is needed before it can be utilized by Ohioans.  According to the Attorney General:  "A constitutional provision is self-executing

when it is 'complete in itself and becomes operative without the aid of supplemental or

enabling legislation.'" Respondent Brief at 7 (citation omitted). Respondent concludes,

> 'the words of a constitutional provision must be sufficiently precise
> in order to provide clear guidance to courts with respect to their
> application.' Article I, Section 21 does not meet these
> requirements and therefore is not self-executing. Thus, Relator's
> Article I, Section 21 claim fails immediately.

*Id.* (*quoting State v. Williams* (2000), 88 Ohio St. 3d 513, 521, 728 N.E.2d 342).

Unlike in the decision relied upon by Respondent, however, the Ohio Health Care

Amendment has very specific guidelines with listed definitions – a far cry from Article I, Section

1, which talks to the existence of basic rights and was at the center of Respondent's cited case.

*See State v. Williams* (2000), *supra,* 88 Ohio St. 3d at 521 ("The question posited is whether the

words of Section I, Article 1 are so broad as to be aspirational ideals that require enabling

legislation to be practically applied, or whether the language is sufficiently definite to make

Section I, Article 1 self-executing."). This Court recognized in *State v. Williams*: "'Natural law'

rights, in and of themselves, are of no legal force. Rather, it is the laws enacted by legislatures

that define the rights of the individual." *Id.* at 523. S

The limited ruling in *State v. Williams* regarding "natural law" rights has no applicability

here. The only other case cited by Respondent for its argument was not even tasked with

deciding the issue of rights derived from any specific Constitutional provision – it dealt with an

over-reaching plaintiff looking to create a private cause of action against an employer for

alleged violations not embodied in the Ohio Constitution **yet found in very specific statutory**

**enactments and regulatory schemes**. *See Provens v. Stark County Board of Mental*

*Retardation & Development Disabilities* (1992), 64 Ohio St. 3d 252, 261, 594 N.E.2d 959

("Concluding, we hold that the courts below properly decided that there was no private constitutional remedy for the plaintiff-appellant's claims in that the Ohio Constitution itself does not provide for a civil damage remedy.  Further, in that there are rather extensive legislative and regulatory schemes providing for the bringing of complaints and charges emanating from civil rights violations, and legislative and regulatory schemes governing employment relationships, and in this regard, the presence here of a collective bargaining agreement with grievance procedures, **the plaintiff has sufficiently broad and inclusive remedies for her alleged wrongs**.") (emphasis added).

Relator and her fellow Ohioans do not have the luxury of a "collective bargaining agreement" or "extensive legislative and regulatory schemes" – as in Respondent's cited case. There is one constitutional amendment, however, that fully and completely applies to this matter – with no other help needed from any other quarters, including the legislative branch.

## CONCLUSION

For the foregoing reasons, Relator respectfully requests that the Court deny the pending Motion to Dismiss; that the Court accept the Complaint and issue a writ of mandamus compelling Respondent to dismantle the Ohio COVID-19 Health Care System; that the Court refer this matter to a master commissioner for further consideration and recommendations in accordance with such writ and any subsequent Orders; and that the Court grant what other relief it deems fair and just.

Respectfully submitted,
/s Terpsehore Maras
TERPSEHORE MARAS
Relator

Dated:  October 18, 2021

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed and a true and accurate copy

was served on October 18, 2021, by electronic mail upon the following:

Andrew D. McCartney, Esq.
Assistant Attorney General
Constitutional Offices Section
30 East Broad Street
16th Floor Columbus, Ohio 43215
Andrew.McCartney@OhioAGO.gov

/s Terpsehore Maras
TERPSEHORE MARAS
Relator