# EXHIBIT "B"

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| TERPSEHORE MARAS, | Case No: 1:21-CV-1711 |
| Plaintiff, | Hon. Solomon Oliver, Jr., U.S.D.J. |
| vs. | |
| GOVERNOR OF OHIO, MIKE DEWINE, MAYFIELD CITY SCHOOL DISTRICT BOARD OF EDUCATION; DR. MICHAEL J. BARNES, in his individual capacity and in his official capacity as Superintendent of the Mayfield City School District; and RON FORNARO, SUE GROSZEK, AL HESS, GEORGE J. HUGHES, and JIMMY TERESI, all in their individual capacities and in their capacities as members of the Mayfield City School District Board of Education, Defendants. | **SECOND AMENDED COMPLAINT** |

Plaintiff, Terpsehore Maras, for her Second Amended Complaint against all Defendants, alleges as follows:

**PARTIES**

1.      Plaintiff Terpsehore Maras is a resident of Cuyahoga County, Ohio and parent of P.M. who is her minor child and at all times relevant has been a student at a Mayfield City School District public school.

2.      Defendant Mike DeWine is a Greene County, Ohio resident and is the duly-elected Governor of Ohio.

3. Defendant Mayfield City School District Board of Education (the "School Board" or the "Board") is a public entity which, acting under color of law, is responsible for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for the Mayfield City School District.

4. Defendant Dr. Michael J. Barnes was at all relevant times the Superintendent of the Mayfield City School District; in that capacity, acting under color of law, he is responsible for the implementation of all official governmental laws, policies, regulations and procedures governing the Mayfield City School District.

5. Defendant Ron Fornaro is a Cuyahoga County resident and member of the School Board, sued here in his individual and representative capacity. Mr. Fornaro is currently the President of the School Board.

6. Defendant Sue Groszek, is a Cuyahoga County resident and member of the School Board.

7. Defendant Al Hess is a Cuyahoga County resident and member of the School Board.

8. Defendant George J. Hughes is a Cuyahoga County resident and member of the School Board.

9. Defendant Jimmy Teresi is a Cuyahoga County resident and member of the School Board. Mr. Teresi is currently the Vice President of the School Board.

-2-

10.     At all relevant times hereto, the Defendants were all acting under color of state law.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. §1331, 28 U.S.C. §§1343(a)(3), (4); 28 U.S.C. § 2201; 28 U.S.C. §1367; 28 U.S.C. § 2201; and 42 U.S.C. §1983.

12.     Given the constitutional and statutory violations outlined in this Second Amended Complaint, there exists an actual and justiciable controversy between Plaintiff and Defendants requiring resolution by this Court.

13.     Plaintiff has no adequate remedy at law and is not seeking monetary damages.

14.     Venue is proper before the United States District Court for the Northern District of Ohio under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiff's claims occurred in the Northern District of Ohio.

## BACKGROUND

F.     **Governor Mike DeWine**

15.     On January 14, 2019, Defendant Governor Mike DeWine took his oath of office administered by his son and Ohio Supreme Court Justice Pat DeWine in which he said that he

would "support protect and defend the constitution of the United States of America and the

constitution of the state of Ohio so help me God."

16.     On March 9, 2020, Defendant Gov. Mike DeWine issued Executive Order

2020-01D.   This was the first step in creating what is hereinafter termed the "Ohio COVID-19

Health Care System". Defendant's Executive Order provides as follows:

> NOW THEREFORE, I, Mike DeWine, Governor of the State of
> Ohio, by virtue of the authority vested in me by the Constitution,
> the laws of this State and in accordance with Section 5502.22 of
> the Ohio Revised Code do hereby order and direct that:
>
> ******
> 3.  After consultation with the appropriate medical
> experts, **the Department of Health shall create and require the
> use of diagnostic and treatment guidelines and provide those
> guidelines to health care providers, institutions and providers**.
>
> 4.  **The Department of Health issue guidelines for private
> businesses regarding appropriate work and travel restrictions, if
> necessary**.
>
> 5.  **State agencies shall develop and implement
> procedures, including suspending or adopting temporary rules
> within an agency's authority, consistent with recommendations
> from the Department of Health designed to prevent or alleviate
> this public health threat**.

(emphasis added).

17.     For months afterwards, Order after Order was issued by Defendant DeWine.

These Orders allowed changes to then-existing rules and regulations promulgated by the Ohio

Board of Pharmacy; the Ohio Counselor, Social Worker, and Marriage and Family Therapist

Board; the Ohio Department of Mental Health and Addiction Services; the State Vision

Professionals Board; the State Board of Education and Ohio Department of Education; the Ohio

Department of Medicaid; the Ohio Department of Developmental Disabilities; and the Ohio

Department of Aging.

18.     The ensuing regulatory changes – all promulgated in response to these Executive

Orders, allowed previous regulations and rules to be suspended in conformance with mandates

specifically set forth within the Ohio COVID-19 Health Care System.  As the backbone for each of

these many new requirements, the Ohio Department of Health (DOH) compelled Ohioans to

adhere to numerous health care mandates.

19.     Effective June 2, 2021, some of these DOH health mandates were rescinded.  The

following orders, however, remain in effect:

> The Director's Amended Order to Require Screening for
> Admission to State Operated Psychiatric Hospitals or to
> Department of Youth Services Facilities, signed March 14,
> 2020.
>
> The Director's Order Designating The Ohio State University
> Wexner Medical Center a Public Health Laboratory, signed
> March 27, 2020.
>
> The Director's Order to Facilities to Notify Residents,
> Guardians and Sponsor of Positive or Probable Cases of
> COVID-19, signed April 15, 2020.
>
> The Director's Order Requiring Reporting and Notification
> Regarding COVID-19 Cases in Kindergarten through Twelfth
> Grade, signed September 3, 2020.
>
> The Director of Health's Order Designating Dayton Children's
> Hospital as a Public Health Laboratory, signed December 23,
> 2020.
>
> The Director's Seventh Amended Order to Permit Access to
> Ohio's Nursing Homes, with Exceptions, signed March 22,
> 2021.

The Amended Director's Order to Permit Access to Ohio's
Residential Care Facilities, with Exceptions, signed March 22,
2021.

The Director's Amended Order for the Testing of the
Residents and Staff of all Residential Care Facilities,
signed May 4, 2021.

The Director's Amended Order for the Testing of the
Residents and Staff of all Nursing Homes, signed
May 4, 2021.

20.     Similarly, even though the "Ohio Public Health Advisory System" launched in July
2020 as part of the Ohio COVID-19 Health Care System has been canceled, the DOH still collects
COVID-19 data under such system.

21.     Before the DOH can share "COVID-19 cases, hospitalizations, deaths, current
trends, key metrics, and vaccination data", such personal data must first be collected from
Ohioans and processed by the DOH.  This personal information obtained by way of the Ohio
COVID-19 Healthcare System does not consist of "public records" merely given their public use.

22.     This DOH COVID-19 data collection process entails many touchpoints.   For
example, if Ohioans "Have questions?" regarding the Ohio COVID-19 Health System, Ohioans
are instructed:  "For answers to your COVID-19 questions, call 1-833-4-ASK-ODH
(1-833-427-5634), available from 9 a.m. to 8 p.m. daily."   Indeed, Ohioans are also informed,
"you can also chat with our Virtual Assistant at gettheshot.coronavirus.ohio.gov for any
COVID-19 vaccine, registration, and scheduling questions."   The
**https://gettheshot.coronavirus.ohio.gov** website does not provide any efficacy and safety
information necessary for true informed consent – only a few links to various bold

pronouncements regarding the confirmed safety and effectiveness of the vaccines **with a link to a "Book My Appointment" link**.

23. If not already "mandated" by the DOH, governmental coercion used to force COVID-19 vaccines on Ohioans is now only slightly below that level. DOH and Defendant DeWine perhaps believe they can evade constitutional scrutiny by simply not yet "mandating" vaccines. The DOH has beeen compelling, directly or indirectly, that Ohioans participate in the Ohio COVID-19 Health Care System.

24. Since May 2021, the Ohio COVID-19 Health Care System has actively recruited Ohioans to enroll in a "vaccination" program. Indeed, the DOH – a state agency under the control of Defendant DeWine, even assists in the booking of COVID-19 vaccines:



(Ohio DOH "Get the Shot" Homepage (Publicly available at

https://gettheshot.coronavirus.ohio.gov/).

-7-

25.   To further convince Ohioans to enroll in and obtain selected health care services,

the DOH's "Myths vs. Facts COVID-19 Vaccine" section of its COVID-19 portal states:  "Evidence

shows immunity provided by the COVID-19 vaccines outlasts natural immunity":



26.                                                                                                     )letely

belied by t

Administration (FDA) for certain individuals after only **months** of being vaccinated while an

overwhelming amount of research during the past several months shows that natural immunity

lasts much longer.   In contrast, vaccinations – other than, for example, Tetanus and its booster

given **after ten years**, generally do not ever need a "booster".  By definition (or at least the

CDC's accepted definition in place on August 26, 2021), a vaccine provides immunity to disease

and the efficacy of a "vaccine" does not degrade in mere months.

27.   Sometime after August 26, 2021 – apparently after the results began flying in the

door, the CDC recognized that the current COVID-19 vaccines were not really "vaccines" under

prior CDC definitions, so the CDC simply changed its longstanding vaccine definition and

**removed** the CDC requirement that vaccines actually produce immunity before being deemed a

"vaccine".   These modifications speak for themselves and need no expert analysis or contrived

explanation:

-8-

> "Vaccine: A product that stimulates a person's immune system **to produce immunity to a specific disease, protecting the person from that disease**."
> *https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm*
> *August 26, 2021, as found on Archive.org* (emphasis added)
>
> ───────────────
>
> "Vaccine: A preparation that is used to stimulate the body's immune response against diseases."
> https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm
> October 16, 2021, as found on current CDC website

28.     The National Institute of Allergy and Infectious Diseases also previously had this to say about vaccines: "Vaccines, **which provide artificially acquired immunity, are an easier and less risky way to become immune**. Vaccines can prevent a disease from occurring in the first place, rather than attempt to cure it after the fact."

29.     **The CDC and DOH's motivations do not matter for purposes of this Second Amended Complaint**. All that matters is that the Ohio COVID-19 Health Care System – which includes prodding private Ohioan companies into requiring COVID-19 vaccines as a condition of employment or obtaining a higher education, undermines constitutionally afforded health care freedoms.

30.     DOH Director Dr. Bruce Vanderhoff – a doctor who presumably understands COVID-19 is a disease with a 99.9% survival rate for those 25 and younger,[1] will continue compelling our young into making potentially life changing health care decisions for no apparent reason:

─────────────

[1] *See Levin, A.T., et al.*, "Assessing the age specificity of infection fatality rates for COVID-19: systematic review, meta-analysis, and public policy implications", Eur J Epidemiol (December 8, 2020) ("The estimated age- specific [infection fatality rate] is very low for children and younger adults (e.g., 0.002% at age 10 and 0.01% at age 25) but increases progressively to 0.4% at age 55, 1.4% at age 65, 4.6% at age 75, and 15% at age 85.") (Publicly available at https://link.springer.com/content/pdf/10.1007/s10654-020-00698-1.pdf).

If you are young and unvaccinated it's now probably only a question of when, not if, you get COVID-19. **When you get COVID-19 without the protection of a vaccine, there is a very real risk you'll end up in the hospital or the obituary pages**. The numbers really tell it all, COVID has changed and is now making younger Ohioans who are not vaccinated very sick. Don't become a statistic when there is a simple, safe, and effective alternative. **Go out today and get vaccinated**.

(emphasis added).

31.     Plaintiff does not dwell on why the medical advice provided by the DOH under the auspices of the Ohio COVID-19 Health Care System is incorrect. These decisions regarding efficacy and safety rely on other governmental sources of guidance, *e.g.*, the CDC and FDA. Given such federal organizations now have political appointees for the first time disregarding the official recommendations of their own experts and revising definitions to suit unknown needs it is not surprising state organizations are making mistakes.

32.     In contrast to what is currently happening in the United States, however, the top health advisors of other countries are changing course based on the most recent studies despite the potential lack of trust this may engender in a government's prior actions or skepticism in future action. For example, on October 8, 2021, the Iceland Directorate of Health ruled that the Moderna vaccine could no longer be used in Iceland until further safety information was obtained.

33.     It is also worth pointing out the mandates springing from the Ohio COVID-19 Health Care System are unlike anything ever before seen in this state.  The Ohio COVID-19 Health Care System is coercively providing medical advice, treatments, and forcing Ohioans to use medical devices without their consent – and at some point, if left unchecked, will likely mandate usage of the COVID-19 vaccines.  This conduct differs from requiring school children

-10-

obtain actual immunization against communicable diseases.   According to the "Ohio
**Immunization** Summary for School Attendance", the following **immunization** vaccines are
required for school attendance in 2021:  Diphtheria, Tetanus, Pertussis, Polio, Measles, Mumps,
Rubella, Hepatitis B, Chickenpox, and Meningococcal.

34.     Even though an argument can be made even these forced **proven** immunization
vaccines are forbidden under the Ohio Health Care Amendment, at least mandatory school
vaccines **do immunize against associated diseases –** which is why these diseases no longer
cause any major problem in the United States.  Moreover, school records involving the school
vaccines are not stored with temperature readings; mask usage/non-usage statistics; contact
tracing data; hospitalization data; or quarantine information all related to the same disease.
That cannot be said for the current batch of COVID-19 "vaccines" that are pushed within the
Ohio COVID-19 Healthcare System.  Indeed, the current steadily increasing number of reported
COVID-19 "breakthrough" cases quickly dispels any such immunity myth.   Despite what may be
stated as "FACT" by the DOH, the long-term efficacy of these COVID-19 vaccines is now clearly
in doubt whereas natural immunity is not.

35.     Research out of Germany shows that the most "vaccinated" areas of the world
for SARS-Cov-2 also have the highest rates of excess mortality. An English translation of the
study's findings explains that the less vaccinated the area, the higher the chances of survival.
Conversely, the more vaccinated the area, the greater the rate of excess mortality.
(https://www.skirsch.com/covid/GermanAnalysis.pdf).

36.     In fact, there has also been a marked uptick in infections after mass vaccinations
took off.  One Pfizer whistleblower – Karen Kingston, placed the increased infection rate

-11-

squarely on the vaccines and suggests there is a 300% increased risk of infection for those who are vaccinated.  Her position regarding this increased risk of infection is backed in part by a "Briefing Document" used in an FDA advisory committee meeting conducted on September 17, 2021. Titled "Application for licensure of a booster dose for COMIRNATY (COVID-19 Vaccine, mRNA)," the briefing document references a study conducted by Pfizer that tested the longevity of immunity provided by their product over time.   *See* FDA Briefing Document, Vaccines and Related Biological Products Advisory Committee Meeting (September 17, 2021) (Publicly available at https://www.fda.gov/media/152176/download) ("The reported incidence of COVID-19 among study participants who completed the primary series <4 months prior to the start of the analysis period was 43.4 cases per 1,000 person-years. In contrast, during the blinded, placebo-controlled follow-up period of the study with data cutoff of March 13, 2021 (prior to the Delta variant surge), the incidence of COVID-19 among BNT162b2 recipients in the Evaluable Efficacy Population (nearly 60% of whom had 4 months or more of blinded follow-up post-Dose 2) was 12.6 cases per 1,000 person-years.").

37.     Ignoring the Ohio Health Care Amendment and contrary to the longstanding tradition of Ohioans deciding their own health care in consultation with their personal physicians and after doing their own research, Defendant DeWine has ratcheted up the Ohio COVID-19 Health Care System by actively promoting the COVID-19 vaccination **of Ohio's children** by launching on October 8, 2021 a vaccine promotion giving away "a chance to win one of 150 $10,000 scholarships or one of five $100,000 grand-prize scholarships."

38.     This coercion of Ohio children comes on the heels of the previous Ohio

"Vax-a-Million" lottery paid for using federal relief money.   To that end, on May 18, 2021, DOH

Director Stephanie McCloud and Ohio Lottery Director Pat McDonald announced,

> **Ohioans 18 and older who have received a received at least
> one dose of the COVID-19 vaccine can enter to win one of five
> $1 million prizes. Ohioans ages 12-17 who have received a
> received at least one dose of the COVID-19 vaccine can enter
> to win one of five four-year, full-ride scholarships**, including
> room and board, tuition, and books, to any Ohio state college
> or university.

(emphasis added).  Given that this contest has since concluded the https://ohiovaxamillion.com

website now forwards to the recently launched "Ohio Vax-2-School" website.  Designed to lure

children, the "Ohio Vax-2-School" contest is found at:  https://www.ohiovax2school.com.

39.     The entry form requires that the participant acknowledge they are "explicitly

waiving any privacy rights" and are providing consent "for the Ohio Department of Health to

verify vaccination status with the health care provider stated. . . ."  The name of a child's

**pharmacy** is even obtained during the entry process.  The page is publicly available at

https://www.ohiovax2school.com/UserInfo.aspx.

40.     The "Eligibility and Verification" rules for Defendant's "promotion" expressly

requires that a participant obtain a vaccination for prize eligibility – there is no other means to

enter.  The page is publicly available at https://www.ohiovax2school.com/Rules.aspx.

**A.     Mayfield School District Board of Education**

41.     The Mayfield School District Board of Education is "composed of five citizens who

are representatives of the residents of Gates Mills, Highland Heights, Mayfield Heights and

Mayfield Village. Board members are elected 'at large' on a nonpartisan ballot and serve for staggered terms of four years." https://www.mayfieldschools.org/BoardofEducation.aspx.

42.     The five individuals currently serving as School Board Members are Defendants Ron Fornaro, Sue Groszek, Al Hess, George J. Hughes, and Jimmy Teresi.

43.     On January 10, 2018, Mr. Fornaro signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Vice-President of the School Board (though he is now President of the School Board) to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted."

44.     On January 8, 2020, Ms. Groszek signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge her duties as a Board Member to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted."

45.     On January 8, 2020, Mr. Hess signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Board Member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted."

46.     On January 10, 2018, Mr. Hughes signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully

-14-

and impartially discharge his duties as a Board Member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted."

47.     On January 10, 2018, Mr. Teresi signed an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Board Member (though he is now Vice-President of the School Board) to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted."

48.     This five-member School Board unanimously appointed Defendant Dr. Michael J. Barnes to serve as Superintendent of Schools, effective July 1, 2021.

49.     As Superintendent, Dr. Barnes is charged with the administration of the MCSD.

**B.     Relevant Policies of the Mayfield School District Board of Education**

50.     Code po0118 of Section 0000 of the School Board's policy manual, titled "PHILOSPOHY OF THE BOARD", provides,

> The Board's philosophy of education gives direction to the educational program and daily operations of the District. (AD)
>
> The primary responsibility of the Board is to establish purposes, programs and procedures which produce the educational achievement needed by District students. The Board must accomplish this while also being responsible for wise management of resources available to the District. The Board must fulfill these responsibilities by functioning primarily as a legislative body to formulate and adopt policy, by selecting an executive officer to implement policy and by evaluating the results; further, it must carry out its functions openly, while ***seeking the involvement and contributions of the public, students, and staff in its decision-making processes.***

-15-

In accordance with these principles, the Board seeks to achieve the following goals to:

***

*__formulate Board policies which best serve the educational interests of each student__*

***

*__maintain effective communication with the school community, the staff, and the students in order to maintain awareness of attitudes, opinions, desires, and ideas__*

***

*__conduct Board business openly, soliciting and encouraging broad-based involvement in the decision-making process by public, students, and staff__*

***

http://go.boarddocs.com/oh/mayoh/Board.nsf/goto?open&id=BETTSC6DA88E (emphasis added).

51.     In addition, the Board's Policy Manual at Section 000, Code po0121 provides,

The United States Constitution leaves to the individual state's responsibility for public education.

The Ohio General Assembly is under mandate by the Constitution of Ohio to provide for the organization, administration and control of a public school system supported by public funds. The Ohio State Constitution also calls for a State Board of Education and a Superintendent of Public Instruction.

The General Assembly has outlined the duties of the State Board of Education and the Chief State School Officer. It has also established a State Department of Education (through which policies and directives of the State Board and Superintendent of Public Instruction are administered) and has established specific types of school districts.

-16-

The Mayfield City School District is classified as a city school district governed by a locally elected Board of Education, hereinafter referred to as the "Board", which is constituted and governed by Code Title 33 of the Revised Code of the State of Ohio. http://go.boarddocs.com/oh/mayoh/Board.nsf/goto?open&id=BETTSD6DA898.

52.     Furthermore, for its "STATEMENT OF PHILOSPHY", the Policy Manual at Section

0000, Code po2110 declares,

The Board of Education believes that the purpose of education is to facilitate the development of the potential of each student. ***In a free society, every individual has both the right and responsibility to make choices and decisions for himself/herself and for society. A prerequisite for every member of such a society in meeting those responsibilities is competence in the use of the rational thought processes needed to make intelligent, ethical choices and decisions. If our society, as originally conceived, is to survive and function effectively, its young people need to be prepared to exercise their rights and their responsibilities in ways that benefit them and the society. Likewise, if individuals are to be able to achieve their life goals in a free society, they need to be competent to choose among the myriad alternatives that are and continue to be available to them.***

http://go.boarddocs.com/oh/mayoh/Board.nsf/goto?open&id=BETTUY6DAC2C          (emphasis

added).

53.     The Board Policy also provides in Section 0000, po0131, in pertinent part,

Proposals regarding Board policies and operations may originate at any of several sources, including students, community residents, employees, Board members, the Superintendent, consultants or civic groups. ***A careful and orderly process is used when examining policy proposals prior to Board action.***

The formulation and adoption of written policies constitute the basic method by which the Board exercises its leadership in the operation of the District. The study and evaluation of reports concerning the execution of its written policies constitute the basic method by which the Board exercises its control over District operations.

-17-

http://go.boarddocs.com/oh/mayoh/Board.nsf/goto?open&id=BETTSJ6DA8CC. _____(Emphasis added).

    54.    Moreover, Section 8000, Code po8420.01, titled "PANDEMICS AND OTHER MEDICAL EMERGENCIES", provides, in pertinent part,

> A pandemic is an outbreak of an infectious disease. The Board of Education directs the Superintendent to set up a Pandemic Response Team ("PRT") to develop a Pandemic Plan in coordination with local government and law enforcement officials.
>
> ***
>
> The Pandemic Plan should be reviewed annually by the PRT and updated as appropriate.
>
> http://go.boarddocs.com/oh/mayoh/Board.nsf/goto?open&id=BETU686 DB887.

    55.    Additionally, Mayfield Board Policy 8450.01, adopted by the Board on September 23, 2020 and attached hereto as **Exhibit F**, explains that the Superintendent's decision to require protective facial covering during pandemic and epidemic events was made "through Board of Education plans/resolution(s) in alignment with public health officials and/or in accordance with government edicts and including any Pandemic Plan developed by the District's Pandemic Response Team under Policy 8420.01."  Notably, the Policy states, "***Facial masks/coverings generally should not include surgical masks*** or respirators ***unless medically indicated (as those should be reserved for healthcare workers)*** or masks designed to be worn for costume purposes." *Id.* (emphasis added).

**C. MCSD's COVID-19-Based Measures**

56.    Through Board Action 0202-060, the Board unanimously adopted the following

resolution:

The Mayfield Board of Education recommended to adopt the suspension of
community communications due to the Coronavirus as delineated in the public
content section:

WHEREAS, On March 11th, 2020 the World Health Organization officially
declared that COVID-19, a novel coronavirus, to be a pandemic. Shortly
afterward, Governor Mike DeWine issued Executive Order 2020-01D declaring
Ohio to be in a state of emergency. The Ohio Department of Health also ordered
that all K-12 schools be closed to students at least through May 1, 2020. Similarly,
residents have been ordered to remain at home until that date to slow the
spread of the disease.

WHEREAS, on March 25th, 2020 the Ohio General Assembly passed an
emergency measure through House Bill 197 which temporarily authorizes boards
of education and other local government agencies to hold remote meetings
during the duration of a health emergency. The provisions of HB 197 will remain
in effect until December 1, 2020 or until the COVID-19 emergency ceases,
whichever comes first.

***

WHEREAS, the Mayfield Board of Education continues to work diligently to
address *__the many challenges that COVID-19 has caused and is likely to cause in
the future as well as complying with and modeling behaviors consistent with
the stay at home order.__*

NOW, THEREFORE, BE IT RESOLVED by the Mayfield Board of Education that it
*__suspends community communications / public comments section of its regular
meeting agendas until the COVID-19 emergency ceases.__*

(emphasis added).

57.    In June 2021, the MCSD, through Defendant Michael J. Barnes, issued a "Plan

for Safe Return to In-person Instruction". In its "Policy for Mitigation Strategies Section", the

MCSD states, "We are anticipating that the health and safety protocols will continue to be

-19-

practiced during the 2021-22 school year. This, of course, depends on orders from the

Governor and the Board of Health. These guidelines are changing, but you can anticipate that

we will require wearing masks and social distancing when in hallways, classrooms, common

spaces and cafeterias."  The Plan also included a statement that "The Mayfield City School

District seeks public input regarding the District's plans for a safe return to in-person

instruction for the 2021-22 school year. Please call 440.995.6800."

     58.     On August 4, 2021, the MCSD, through Defendant Dr. Michael J. Barnes, issued

a Mask Recommendation to Mayfield teachers, staff, parents, and students, in which the MCSD

stated,

> Our goals for our students, staff, and community:
>
> • Maintain a healthy and safe environment
>
> • Keep our students learning in person, together, in our schools
>
> • Provide choice
>
> Late this summer, the Centers for Disease Control and Prevention (CDC), the American Academy of Pediatrics (AAP) and Ohio Department of Health (ODH) released updated recommended guidance on the safe return to school for students and staff. There are several key takeaways that serve as the foundation for the Mayfield City School District's reopening plan this school year:
>
> **<u>Face masks in grades Pre-K-12 are strongly recommended for our students, teachers and staff.</u>**
>
> **→ Wearing a face mask may greatly reduce the risk of students, teachers and staff having to quarantine if a COVID -19 positive case/s are reported in any of our Mayfield schools.**

➔ **It is your right to wear or not wear a face mask. We support either decision. Please be respectful of the choice of our students, teachers and staff.**

The Mask Recommendation also provides, in pertinent part,

2. As of this date, there is **no state-wide required masking mandate** for the 2021-2022 school year for staff or students.

3. **The Mayfield City School District supports all students or staff members in their <u>choice</u> to wear a face mask.** It is important to note that the Ohio Department of Health **strongly recommends** masks be worn indoors by all individuals who are not fully vaccinated (age 2 years and older). The CDC and CCBH as of August 3, 2021, now recommend that all individuals (vaccinated or not) wear a mask while indoors where community transmission is high.

*Id.* at pp. 1-2 (emphases in original). In addition, the Mask Recommendation states that

"**Wearing a face mask may greatly reduce the risk of students, teachers and staff having to quarantine if a COVID-19 positive case/s are reported in any of our Mayfield schools. We will** continue to monitor the guidance and recommendations of the Centers for Disease Control and Prevention, State of Ohio and Cuyahoga County Board of Health." *Id.* at p. 2 (emphasis in original).

59.     On August 21, 2021, Defendant Dr. Michael J. Barnes sent an e-mail to Mayfield teachers, staff, parents, students and community (the "mask mandate") stating as follows:

Earlier this week, the district issued a face mask mandate in Grades Pre-K-5 to protect our younger students who are ineligible for a COVID-19 vaccine, along with a strong recommendation for students in grades 6-12 to wear a face mask.

***<u>The decision to issue a mandate to students 12 years and younger was supported by the survey the district conducted August 12-14th. Those survey results also indicated most parents intended for their children in grades 6-12 to wear a mask while in school.</u>***

-21-

Students returned to campus during phase-in schedules, beginning August 16th with all students on campus at full capacity on August 18th. ***During this week, school officials have observed very few students in grades 6-12 wearing face masks. This is concerning. Our priorities for this school year are to maintain the health and safety of our school community and continue learning in person, in school, together.***

Therefore, pursuant to Mayfield Board Policy 8450.01 Mayfield City Schools will mandate face masks in all school buildings for all students, teachers, staff and visitors in grades Pre-K-12, effective Monday, August 23rd. We will review the mandate weekly and give updates at regular Board of Education meetings.

***The district's Pre-K-12 face mask mandate for students, staff and visitors in our schools is our best organizational strategy to support and protect our students' academic time and to maintain a stabilized learning environment.***

\*\*\*

(emphases added.)

**D. Plaintiff Place Defendants on Notice of Lawsuit.**

60.     Upon receiving the Superintendent's e-mail, Plaintiff, Terpsehore Maras, e-mailed

a response to the Defendants informing them that she would be filing a lawsuit due to the

Defendants' violation of Ohio's open meetings laws and violation of the United States and Ohio

Constitutions through their commission of unauthorized restrictions of liberty; identification of

a minor as a potential public health risk with no jurisdiction; identification and declaration of a

minor as a potential public health risk with no evidence; declaration of mandates to restrict a

minor's liberty with no legal jurisdiction; declaration of mandates that have no legal jurisdiction

to restrict civil liberties; declaration of mandates restricting liberties with no prior public

comment; declaration of mandates imposing dress code that does not align with dress code

-22-

regulations; declaration of mandates as medical experts; and deprivation of students' and parents' civil liberties with no authority."

61.  In her letter, Ms. Maras also informed Defendants that she was sending a copy of the letter to Ohio Attorney General David Yost.

62.  Ms. Maras concluded her letter by noting that she would be seeking a temporary restraining order unless the purported "mandate" was not rectified by the close of business on August 23, 2021.

**E. August 25, 2021 Regular Meeting of the School Board**

63.  Thereafter, on August 23, the School Board issued its agenda for its next regular meeting, scheduled for Wednesday, August 25.   The agenda indicated that the mask mandate would be discussed at the meeting.

64.  At the August 25, 2021, meeting, Plaintiff approached the School Board members to speak during open discussion of the mandate despite objections from the School Board that Ms. Maras did not have the right to speak since she did not submit an application to speak.  In fact, Ms. Maras had arrived at the meeting location and completed an application to speak long before the mask mandate discussion commenced but no one from the School Board accepted Ms. Maras's application to speak.

65.  Once she was finally permitted to speak, which was at the end of the mask mandate discussion, Plaintiff first notified the School Board that upon learning the School Board

would be discontinuing public comments during virtual meetings due to COVID, she e-mailed

the Board members to ask why public comments were being disabled given that, to her

knowledge, COVID cannot be transmitted via a computer or telephone. Plaintiff stated at the

meeting that the Board never replied to her e-mail and that she was never invited to comment

on the Superintendent's decision to reinstate to mask mandate on August 20.

66.    Plaintiff also informed Defendants that she was in possession of pictures recently

taken of the Defendants at parties not wearing masks.  Moreover, she explained that went she

arrived at the Superintendent's office on August 23 to hand-deliver the notice of intent to sue,

she encountered three individuals, the Assistant Superintendent, the Assistant to

Superintendent Michael J. Barnes, and a third employee, who were not wearing masks despite

the mask mandate requiring them to do so.

67.    Plaintiff, referring to guidance from the Center for Disease Control and

Prevention ("CDC"), also pointed out that in contravention to the School Board's masks

mandate for students in grade Pre-K through 5, the CDC holds the position that masks mandates

for children that young are detrimental and have zero efficacy.


**E.  Defendants' Actions Cause Immediate and Irreparable Harm to all Ohioans, including Plaintiff.**

68.    Stephen E. Petty, an expert in the field of Industrial Hygiene who has testified as to the futility and danger caused by an individual wearing a mask in order to avoid transmitting or becoming infected with Covid-19, has sworn to the following:

***

2.    Since April 14, 1996, I have owned and operated EES Group, Inc., a consultancy corporation specializing in health and safety and forensics.

3.    I hold relevant industry certifications including board certifications as a C.I.H. (Certified Industrial Hygienist), a C.S.P. (Certified Safety Professional), and a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas, and West Virginia).

4.    I have served as an expert in personal protective equipment and related disciplines in approximately 400 legal cases. I am certified in and have provided testimony as an expert in these areas.

5.    For example, I am currently serving as an expert in the Monsanto Roundup and 3M PFAS litigation. Recently I testified in four trials for the DuPont C8 litigation.

6.    I taught Environmental and Earth Sciences as an adjunct professor at Franklin University.

7.    I hold nine U.S. patents relating to heating, ventilation and air conditioning (HVAC) systems.

8.    I am a current member in good standing of the following relevant associations: American Industrial Hygiene Association (AIHA), American Board of Industrial Hygiene (ABIH), American Conference of Governmental Industrial Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE); Member ASHRAE 40 Std. and TC 2.3, and Sigma Xi.

9.    I am an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, evaluation, and control of

those environmental factors or stressors — including viruses — arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community.

10.     Industrial Hygiene is fundamentally concerned with the proper methods of mitigating airborne/dermal hazards and pathogens, as well as with the design and use of engineering controls, administrative controls, and personal protective equipment, among other things.

11. Medical doctors, virologists, immunologists, and many public health professionals are not qualified experts in these areas by virtue of those aforementioned credentials.

12. On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic (https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-
transmission.html).

13. Airborne viral aerosols can consist of a single viral particle or multiple viral particles clumped together, and usually smaller than 5 $\mu$ (microns) in size. By comparison, droplets are >5 $\mu$ to >10 $\mu$ in size.

14. The area of a micron by a micron is approximately 1/4,000th of the area of the cross-section of a human hair and 1/88th the diameter of a human hair. Covid particles are 1/10 of a micron or ~1/40,000th of the area of a cross section of a human hair and ~1/880th the diameter of a human hair.

15. A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25$\mu$ to 0.5$\mu$ in size. Particles smaller than 5$\mu$ are considered very small and/or     very fine      or      aerosols (https://www.ijidonline.com/action/showPdf?pii=S1201-9712%2821%290037
5-1).

16. Very small particles do not fall by gravity in the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks.

17. Because they stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor.

18. Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

19. Exposure to airborne aerosols is a function of two primary parameters: concentration and time. Less is better regarding both parameters.

20. For many reasons, personal protective equipment (PPE) is the <u>least</u> desirable way to protect people from very small airborne aerosols. Moreover, masks are not PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPS), namely 29 CFR 1910.134 (https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134).

21. Regarding PPE, facial coverings do not effectively protect individuals from exposure to very small airborne aerosols. A device referred to as a respirator is required to provide such protection.

22. The AIHA, in its September 9, 2020 Guidance Document for COVID-19 noted that the acceptable relative risk reduction methods must be >90%; masks were shown to be only 10% and 5% (see Figure 2) and far below the required 90% level (https://aiha-assets.sfo2.digitaloceanspaces.com/AIHA/resources/Guidance-Documents/Reducing-the-Risk-of-COVID-19-using-Engineering-Controls-Guidance-Document.pdf).

23. Similarly, Shah et al, 2021, using ideally sealed masks and particles 1 micron in size, reported efficiencies for the more commonly used cloth masks and surgical masks of 10% and 12% respectively. No mask can be perfectly sealed, thus "real world" effectiveness would be even lower (https://aip.scitation.org/doi/pdf/10.1063/5.0057100).

24.     Industrial hygienists refer to a "Hierarchy of Controls" that are typically implemented to minimize exposures, including exposures to very small airborne aerosols like Covid-19.

25.     Regarding practical or "engineering" controls, industrial hygienists focus on practices that dilute, destroy, or contain airborne hazards (or hazards in general).

26.     PPE — especially facial coverings — do not dilute, destroy, or contain airborne hazards. Therefore, facial coverings are not contained in the Industrial Hygiene (IH) Hierarchy of Controls. Even respirators (part of the PPE Category and not masks) are in the last priority on the Hierarchy of Controls.

27.     Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. Thus, ordinary facial coverings <u>do not</u> provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection.

28.     For example, during the seasonal forest fires in the summer of 2020, the CDC issued public guidance warning that facial coverings provide no protection against smoke inhalation. That is because facial coverings do not provide a reliable level of protection against the small particles of ash contained in smoke. Ash particles are substantially larger than Covid-19 aerosolized particles.

29.     I have reviewed the policy of the Mayfield City School District (MCSD) regarding the use of masks.

30.     Ordinary facial coverings like the ones required by the MCSD mask policy do not meet any of the several key OSHA Respiratory Protection Standards for respirators.

31.     Because of the gaps around the edges of facial coverings required by MCSD's policy, they do not filter out Covid-19 aerosols. The policy stating masks will be worn without gaps defies known science that masks worn today cannot be sealed and always have gaps.

32.     The effectiveness of a cloth facial covering falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering.

33.     Most over-the-counter disposable facial coverings including cloth and/or over-the-counter disposable surgical masks have edge gaps of 10% or more. When

adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10%.

34.     Even short breaks (e.g. to eat) expose individuals to Covid-19 aerosols in indoor spaces.

35.     Ordinary cloth facial coverings like the ones required by the MCSD's mask requirement do not provide any filtering benefit relative to particles smaller than 5μ if not sealed.

36.     Substantial mitigation of Covid-19 particles could be immediately achieved by:

> a. opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),
>
> b. setting fresh air dampers to maximum opening on HVAC systems,
>
> c. overriding HVAC energy controls,
>
> d. increasing the number of times indoor air is recycled,
>
> e. installing needlepoint ionization technology to HVAC intake fans, and
>
> f. installing inexpensive ultraviolet germicide devices into HVAC systems.

37.     All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling exposures in place for nearly 100 years. The use of cloth facial coverings do not fit within these basic hierarchy of controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

38.     Extended use of respiratory PPE is not indicated without medical supervision.

> 39.     As explained in a recent April 20, 2021 paper by Kisielinski et al, attached hereto as **Exhibit iii** and entitled "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?" that was published in the *International Journal of Environmental Research and Public Health* (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8072811/), the following negative effects from wearing masks was reported in the literature:

-29-

Figure 5. Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

Example statements made in the paper include the following: "The overall possible resulting measurable drop in oxygen saturation (O2) of the blood on the one hand and the increase in carbon dioxide (CO2) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." Exhibit iii, p. 25. In fact, "Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population)." Exhibit iii, p. 24, for these reasons, students who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, or damage.

40. A recent summary of the literature on these topics was produced on September 4, 2021 and is attached is **Exhibit iv**; in summary it proves that:

   a. PPE is the least desirable way to protect people from very small airborne aerosols.

   b. Facial coverings as required by the MCSD's policy are not recognized as PPE since they cannot be sealed and are not covered by the OSHA RPS.

-30-

c.  If PPE were to be used for protection, respirators, not facial coverings as required by the MCSD's policy are needed to provide any effective protection from very small airborne aerosols.

d.  Very small aerosol particles are more likely to be a greater cause of disease than respiratory droplets because they can evade PPE and reach deep into the lungs, whereas respiratory droplets have to work against gravity in order to travel up a person's nose into the sinus and typically rapidly fall to the ground.

e.  <u>Based on cited literature, individuals who are required to wear masks pursuant to a mandate have the known potential to suffer immediate and irreparable injury, loss, and damage due to the overall possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.</u>

f.  *As demonstrated, it seems rational (i.e. prudent person) and scientifically corroborated (in accordance with indisputable, Industrial Hygiene Science/Engineering evidence) that facial coverings/masking DO NOT "prevent the spread of communicable diseases" even close to the relative risk reduction guidance stated by AIHA.*

*<u>Also, from an industrial hygiene exposure control perspective, I am confident that, beyond a reasonable doubt, facial coverings/masking DO NOT "prevent the spread of communicable diseases," in this case SARS CoV-2 and its collection of symptoms known as COVID-19 based on the literature since masks cannot be sealed. Further, even N-95 respirators, which can be sealed, are not recommended by a key manufacturer (3-M) to stop biological infectious diseases "The respirator ... cannot eliminate the risk of infection, illness, or disease."</u>*

g.  *<u>Finally, from an industrial hygiene (i.e., exposure control) standpoint, much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction), and should be used to minimize exposures as opposed to masks.</u>*

69.     According to multiple independent analyses, the death rate from the COVID vaccines used in the US is at least 400 deaths per million doses or 800 deaths per million fully vaccinated.  This makes the COVID vaccines the most dangerous vaccine ever created in history. They are 800X more dangerous than the smallpox vaccine with respect to death, and over 25X worse with respect to permanent disability.  Estimating the number of COVID vaccine deaths in America, November 1, 2021 (Publicly available at https://www.skirsch.com/covid/Deaths.pdf).

70.     Moreover, significant side effects – such as cardiac incidents of healthy persons who recently took the "vaccine", are merely swept under the rug.  See *Gundry*, *S*, "Abstract 10712: Mrna COVID Vaccines Dramatically Increase Endothelial Inflammatory Markers and ACS Risk as Measured by the PULS Cardiac Test: a Warning,"Circulation (November 8, 2021) ("We conclude that the mRNA vacs dramatically increase inflammation on the endothelium and T cell infiltration of cardiac muscle and may account for the observations of increased thrombosis, cardiomyopathy, and other vascular events following vaccination.").

71.     Plaintiff's daughter has also sustained bullying from MCSD teachers given her unwillingness to wear a mask.  Her teachers aggressively seek enforcement of the MCSD mask mandate in that they "do bully me continuously, they are short with my questions and never choose me when I raise my hand, they bush me off consistentl[y]."  This is not the school environment required under Defendants' own policies. When students try and avoid wearing a mask, the teachers do the following to students:  "They yell at them, and take points off of their

-32-

assignments just like mine, but usually they write them up, and bully the students into wearing

a mask. They will call them arrogant and ugly minded, and that they "will not go far if they lack

common human decency." In other words, Defendants permit ongoing harassment by teachers

as a means of enforcing an unconstitutional mask mandate.

72.     Plaintiff Terpsehore Maras, independently and on behalf of her minor child, P.M.,

is aggrieved with immediate and irreparable injury, loss, and damage given the policies and

actions of Defendants, which are not only unsupported by science, but which also result in

physical injury to her and numerous Ohioans. Injuries were directly caused by the

unconstitutional Ohio COVID-19 Health Care System, including by way of employers and schools

ignoring the Ohio Health Care Amendment while citing DOH "guidelines" as justification for

instituting mask, COVID-19 vaccine, and other heatlcare mandates.  All these private actors also

forward improperly obtained personal data to the DOH for use in the Ohio COVID-19 Health

Care System.  If the Ohio government encourages specific behavior, Ohioans can only presume

that such behavior withstands constitutional scrutiny, especially given the state's chief executive

is sworn to uphold the Ohio Constitution.  It is now incumbent on Defendants to remedy this

situation by dismantling the Ohio COVID-19 Health Care System first promulgated by Defendant

DeWine.

73.     As recognized by the Court of Appeals for the Sixth Circuit when addressing a

college's COVID-19 vaccine mandate, the alleged violation of a constitutional right *ipse dixit*

demonstrates "irreparable harm" to a victim.  *Dahl v. Bd. of Trs. of W. Mich. Univ.*, No. 21-2945,

Slip Op. * at 10 (6th Cir. October 7, 2021) ("Enforcement of the University's [COVID-19 vaccine

mandate] policy likely would deprive Plaintiff of their First Amendment rights, an irreparable

injury. . . . Proper application of the Constitution, moreover, serves the public interest, as "it is

always in the public interest to prevent the violation of a party's constitutional rights".  On

balance, Plaintiff's strong likelihood of success on their free exercise claim carries the day.")

(citations omitted).

**COUNT I**
**FEDERAL CLAIMS BASED ON DEFENDANTS' VIOLATION OF**
**42 U.S.C. § 1983 AND FEDERAL CONSTITUTIONAL**
**VIOLATIONS UNDER THE NINTH, TENTH AND FOURTEENTH**
**AMENDMENTS**

74.     Plaintiff incorporates by reference all prior allegations set forth above.

75.     Defendants' mandating the wearing medical devices that are neither effective

nor safe ignores the Federal and Ohio Constitutions and is contrary to the longstanding tradition

of Ohioans deciding their health care in consultation with their personal physicians and after

doing their own research.

76.     Plaintiff is not seeking any compensation for damages.   By way of this Second

Amended Complaint, Plaintiff only seeks declaratory and injunctive relief against Defendants to

prevent ongoing and future harm given there is a "reasonable expectation" that Defendant's

constitutionally offensive policies and actions will be continually enforced.

-34-

77.     Plaintiff does not stand alone in that she has affidavits of hundreds of other parents in support of Plaintiff's allegations. Courts across the nation can continue to expect to receive the pleadings of parents who are angered by the arbitrary measures being implemented by school boards under the guise of caring for American children.

78.     Defendants are all duly elected officials with the exception of Defendant Dr. Michael J. Barnes, who is the Superintendent of the Mayfield City School District, and acting under color of state law enacted various state mandates that were never effective at stopping the spread of SARS-CoV-2 – the virus particle that causes COVID-19, or were ever safe to Ohio citizens.  For example, COVID-19 is transmitted via aerosol particles that linger in the air for days so the only effective means of control in an indoor setting is via dilution, destruction or containment – which is also why facial coverings provide no protection.  Most importantly, long-term mask usage is harmful to Ohioans.

79.     Under 42 U.S.C. § 1983, an individual may bring a private cause of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute.   Plaintiff was deprived of four federal separate constitutional rights.

      a. **Plaintiff has a procedural due process right that was violated**

80.     "[T]he Due Process Clause [of the Fifth Amendment] provides that certain substantive rights - life, liberty, and property - cannot be deprived except pursuant to constitutionally adequate procedures."  The Fourteenth Amendment takes the Fifth Amendment's Due Process Clause and provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. V; U.S. Const. Amend. XIV. No Ohioan ever ceded healthcare decisions to governmental officials simply by voting them into office.  By usurping such personal autonomy, Defendant has deprived Plaintiff and her minor daughter of liberty interests without benefit of due process.

81.     Defendants' policies and actions unlawfully deprive Plaintiff and her minor daughter of these and other constitutionally-protected interests without due process of law. Such deprivations occurred with no notice or meaningful opportunity to be heard.  Such deprivations were arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the existing policies and other applicable laws. Such deprivation violates the Fifth and Fourteenth Amendments of the United States Constitution.

82.     In essence, legitimate government exists by deriving from the voluntary grant of the people for their benefit. However, every extension of the administrative authority beyond the constitutional limits is absolutely an act of usurpation of government.

**b.  Plaintiff has substantive due process rights that were violated**

83.     The Due Process Clause under the Fourteenth Amendment guarantees also "includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests."   More specifically, the Due Process Clause prohibits governmental interference with rights "rooted in the traditions and

-36-

conscience of our people as to be ranked as fundamental" or "implicit in the concept of ordered liberty."  Plaintiff's right to make healthcare and educational upbringing decisions regarding her minor child – two of the most personal and important of parental decisions, constitute rights so basic and fundamental and so deep-rooted in our society that they stand as substantive constitutional rights.   In fact, the Supreme Court has for nearly one hundred years jealously guarded a parent's liberty interests in raising their children – affirming a constitutional custodial right protecting the right of parents to decide on the care and upbringing of their children.

84.     Coupled with Plaintiff's fundamental right to raise her minor daughter without governmental intrusion there exists another applicable fundamental right – this one derived from Plaintiff's daughter and now asserted on her behalf.  Whether couched as an "informed consent" right or the fundamental right to make healthcare decisions, the fundamental liberty right to choose one's healthcare has long been recognized by the Supreme Court.  The existence of Plaintiff's two fundamental rights allowing her to direct healthcare decisions for her minor child means that "[g]overnment actions that burden the exercise of [these rights] are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest."   To be narrowly tailored, a law must be the least restrictive means of accomplishing the legislature's compelling interest.   The policies and actions in question were not so narrowly drawn and should be rejected as violative of Plaintiff's substantive due process rights.

### c.  Plaintiff has a Ninth Amendment right that was violated

85.     Under the Ninth Amendment:  "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."  U.S. Const.

Amend. IX.  The Ninth Amendment was added to the Bill of Rights to ensure no one could "deny fundamental rights merely because they were not specifically enumerated in the Constitution."

86.     Plaintiff's Ninth Amendment liberty rights in self-determining healthcare decisions and in parenting – rights not found in the Bill of Rights, are recognizable.   They are basic and fundamental rights deep-rooted in our society and merits protection from state interference unless such interference is narrowly tailored to suit a compelling need.  Such rights were violated by Defendants.

87.     The Ninth Amendment on it's own was concerning to Alexander Hamilton as it is to many citizens in respects to interpretation. In layman terms, the Ninth Amendment declares the Bill of Rights defines some constraints on federal power, but this may be left open and imply that federal power is elseways not constrained.  Both the Ninth and Tenth Amendment are viewed and seem to be in tandem resonating and reinforcing the key principle of our rights as citizens of this nation are to reserve the people's retained powers and rights and int turn preserve the rights of  local self-government

### d.  Plaintiff has a Tenth Amendment right that was violated

88.     Under the Tenth Amendment:  "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."  U.S. Const. Amend. X.  Defendant is in violation of the Tenth Amendment even though this constitutional prohibition is intended to protect state actors.

89.     Specifically, the Federal Government has improperly intervened in the most local of matters, namely personal healthcare decisions and how local schools should be run.  For example, Plaintiff's local school district received significant federal funding directly related to its

implementation of COVID-19 mitigation efforts.    The state of Ohio was given billions of dollars by agreeing to implement the federal guidelines set forth by the CDC for COVID-19 mitigation efforts.  Moreover, Defendant relied on scientifically unfound and constitutionally repugnant guidance by federal government agencies and enacting an oppressive a dangerous universal mask mandate in misguided reliance on the information provided by the federal government. Such meddling is improper under the Tenth Amendment and any remnants of this interference should be rejected.

90.    In all court cases discussing and or examining the rights of the people, it is common that the federal government and or state government and in general all authority demonstrated over the people receive the most strict construction to if their instruments can and hold authority over that of the rights of a state or of the people, collectively or individually.

### COUNT II
### VIOLATION OF ARTICLE I, SECTIONS 16 AND 21
### OF THE OHIO CONSTITUTION

91.    Plaintiff incorporates by reference all prior allegations set forth above.

92.    Procedural and substantive due process violations under the U.S. Constitution constitute equivalent violations under the Ohio Constitution.   Accordingly, for the reasons set forth above, Plaintiff should respectfully be permitted to pursue her claims under Article I, Section 16 of the Ohio Constitution.  Ohio Const. Art. 1, § 16.

Article I, Section 21 of the Ohio Constitution reads in part:

> **Preservation of the freedom to choose health care** and health care coverage

> §21 (A) **No federal, state, or local law or rule shall compel, directly or indirectly, any person**, employer, or health care provider **to participate in a health care system**. . . .

-39-

(E) As used in this Section. . .  (2)  **"Health care system"**
**means  any public or private entity or program whose**
**function or purpose includes the management of,**
**processing of, enrollment of individuals for,** or payment
for, **in  full  or  in  part, health care services, health care**
**data, or health care information for its participants**.

Ohio Constitution Article I, Section 21 (emphasis added).[2]

93.     The Ohio Health Care Amendment was placed on the November 8, 2011 ballot as

an initiated constitutional amendment and passed with over 65% of the vote.   Even though the

measure was initially launched in response to former President Barack Obama's signing of a

2010 national health care mandate law, the amendment's final language comfortably serves

---

[2] Read in its entirety:

Preservation of the freedom to choose health care and health care coverage

§21 (A) No federal, state, or local law or rule shall compel, directly or indirectly, any person,
employer, or health care provider to participate in a health care system.

(B) No federal, state, or local law or rule shall prohibit the purchase or sale of health care or
health insurance.

(C) No federal, state, or local law or rule shall impose a penalty or fine for the sale or purchase
of health care or health insurance.

(D) This section does not affect laws or rules in effect as of March 19, 2010; affect which
services a health care provider or hospital is required to perform or provide; affect terms and
conditions of government employment; or affect any laws calculated to deter fraud or punish
wrongdoing in the health care industry.

(E) As used in this Section,

(1) "Compel" includes the levying of penalties or fines.

(2) "Health care system" means any public or private entity or program whose function or
purpose includes the management of, processing of, enrollment of individuals for, or payment
for, in full or in part, health care services, health care data, or health care information for its
participants.

(3) "Penalty or fine" means any civil or criminal penalty or fine, tax, salary or wage withholding
or surcharge or any named fee established by law or rule by a government established, created,
or controlled agency that is used to punish or discourage the exercise of rights protected under
this section.

Ohio Constitution Article I, Section 21

today as a constitutional safeguard against the conduct of Defendant.  The Official Explanatory Statement for this successful ballot initiative states the Ohio Health Care Amendment was explicitly initiated to "preserve the freedom of Ohioans to choose their health care."

94.     The Official Explanatory Statement in favor of this successful ballot initiative begins: "Protect your health care freedom, preserve your right to choose your doctor and health insurance, **and keep government out of your personal medical decisions**." (emphasis added).  As well, according to this same Official Explanatory Statement, if this Constitutional Initiative does not pass, "government can . . . Force you to disclose private medical information [and] Prohibit you from obtaining private medical treatment."  In other words, Ohioans voted for the Ohio Health Care Amendment as a means of preventing the Ohio COVID-19 Health Care System from ever coming into existence.

95.     Plaintiff previously filed a Complaint before the Ohio Supreme Court seeking mandamus relief against Defendant DeWine.  The Governor moved to dismiss given it was alleged "Plaintiff actually seeks prohibitory injunctions, apparently to stop all COVID-19-related recommendations or requirements in the State of Ohio, as well as to direct Defendant to follow the Ohio Constitution in the future."   The Ohio Attorney General – on behalf of Defendant DeWine, argued before the Ohio Supreme Court:  "Plaintiff has an adequate remedy at law for the entire Complaint in the form of a declaratory judgment and prohibitory injunctions."

96.     Given that that Ohio Supreme Court decided on November 24, 2021 in favor of the Defendant DeWine – dismissing the action without any written opinion, this forum is now guided by such decision and seeks the relief not able to be obtained before the Ohio Supreme

-41-

Court given the prior motion of Defendant.  Defendant is now collaterally estopped from

making any contrary argument in this Court.

97.      As part of the Ohio COVID-19 Health Care System, Defendant Mike DeWine

actively encouraged others to violate the Ohio Health Care Amendment – thereby curtailing

Ohioans' constitutional right to the "preservation of the freedom to choose health care."  For

example, on September 17, 2021, Defendant Mike DeWine issued the following press release:

> Ohio Governor Mike DeWine today announced that
> nearly 58% of Ohio's public K-12 students are required by their
> local school to wear masks in schools. On September 1st only
> 35% of Ohio students were required to wear a mask.
>
> **"I am pleased to see more school superintendents and
> school boards make the right decision and require masks to
> protect students and teachers from COVID-19 spread,"** said
> Governor DeWine. **"We share a common goal** of ensuring kids
> are in school, in person, five days a week. While **vaccinations
> remain the best protection** against severe COVID-19 cases,
> **masking will help protect those** that can't yet receive the vaccine
> and adds another layer of protection for those that have."
>
> The **mask policies are working to limit the spread**. In
> Ohio school districts where masks are optional, **case rates are
> higher than in districts that require some masking**, and we see
> **better week-to-week trends in schools where everyone wears a
> mask**. Most importantly, there have been **fewer quarantines in
> schools where everyone wears a mask**, helping us towards
> meeting the goal of keeping Ohio children in the classroom.

(emphasis added).

98.    Despite the fact state-wide mask mandates were rescinded on June 2, 2021,[3]

Defendants' school mask mandates stand as local rules in furtherance of the unconstitutional

Ohio COVID-19 Health Care System.  Ohio school boards such as MCSD have promulgated local

rules that compel students participate in a health care system, namely a "program whose

function or purpose includes the management of, processing of . . . health care services, health

care data, or health care information for its participants." Ohio Constitution, Article I, Section 1.

99.    By way of background, Section 201(h) of the Federal Food, Drug, and Cosmetic

Act states that a medical device is "any instrument, machine, contrivance, implant, in vitro

reagent that's intended to treat, cure, prevent, mitigate, diagnose disease in man or other

animals." 21 U.S.C. § 321(h).   Given the sort of 3-ply surgical masks required by schools are

used to prevent a disease, they are being used as medical devices.

100.    In fact, the FDA categorizes commonly used 3-ply surgical masks as a "Class 2"

medical device.  And, this FDA designation is recognized by the Occupational Safety and Health

Administration:  "Surgical masks are typically cleared by the U.S. Food and Drug Administration

as medical devices and are used to protect workers against splashes and sprays (i.e., droplets)

containing potentially infectious materials."

101.    Unlike with a standard medical device, proof of efficacy to mitigate disease was

likely never determined by any Ohio School Board – including Defendant Mayfield City School

_____

[3] Before being rescinded effective June 2, 2021, the DOH Director's mask mandate, "Second
Amended Order for Social Distancing, Facial Coverings and Non-Congregating", dated May 17,
2021, required:  "Except as provided herein, all individuals that are not fully vaccinated in the
State of Ohio shall wear facial coverings at all times when:  i. In any indoor location that is not a
residence; ii. Outdoors and unable to consistently maintain a distance of six feet or more from
individuals who are not members of their family/household; or iii. Waiting for, riding, driving, or
operating public transportation, a taxi, car service, or a ride sharing vehicle.  This does not apply
to private or rental vehicles where members of a family/household are sharing a vehicle."

District Board of Education, before issuing mask mandates.  It is almost superfluous that the most current research – research completely disregarded by the Ohio COVID-19 Health Care System, demonstrates that masks **are neither effective nor safe for long term usage** or that there are much better options to stop the transmission of SARS-CoV-2.   As with the COVID-19 vaccines, this action is not concerned with demonstrating the lack of safety or efficacy in masks or the improper mandated use of medical devices despite the near complete lack of risk to children exposed to SARS-CoV-2 – this Complaint only seeks removal of the Ohio COVID-19 Health Care System given its clear flouting of a constitutional amendment.

102.    An entire healthcare system created by Defendant is in violation of Article I, Section 21 provides medical advice every day to thousands of Ohioans while coercing and advocating for the use of unhealthy medical devices.

103.    This Second Amended Complaint compels the Governor to act in compliance with a clear Constitutional mandate impacting all Ohioans.  It is one thing to issue harsh bandwagon health mandates to stop a virus with an acknowledged 99% survival rate in most of the Ohio population.  It is quite another thing to do so despite an existing constitutional bar against the implementation of this massive government-run health care system.

104.    Plaintiff does not request that the dismantling of the Ohio COVID-19 Health Care System occur in any specific manner – only that the current Ohio COVID-19 Health Care System be removed as required by the Ohio Health Care Amendment.   If vaccines and masks do not effectively stop infection and transmission for all citizens, then even if they provide some level of health benefit with certain segments of the population, they should **never be mandated or monitored** in the same way forced weight loss, regular exercise or teetotaling should never be

-44-

mandated or monitored.   By promoting a health care system that tracks health data and actively promotes ineffective and potentially harmful vaccines and masks within that tracking system, Defendant not only violates the Ohio Constitution – such activities also endanger the health and welfare of Ohioans.

105.    The people of Ohio through their legislative representatives established these Amendments to clearly outline the rights they have retained in union.  It is clear and evident from Article I Section 21 of the Ohio State Constitution that the people reserve all rights over decisions regarding their health and no exclusion, clauses or "Acts of God" have been included in the verbiage of the Amendment. In fact, the people outlined and clearly defined all aspects of this Amending including medical devices, health insurance, health choices, medications and much more to ensure that they made it clear that they retain full sovereignty over their own bodies.  Therefore, it is incomprehensible that I, a citizen of the United States and the state of Ohio must even be justifying my complaint when it is clearly written in the Ohio State Constitution and the authority it bears granted to it by the Ninth and Tenth Amendment of the U.S. Constitution.

## POINT III
### DECLARATORY JUDGMENT

106.    Plaintiff incorporates by reference all prior allegations set forth above.

107.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiff is entitled to a judicial declaration that the conduct outlined in this Second Amended Complaint is in violation of Plaintiff's federal and state constitutional rights.   Specifically, Plaintiff seeks a declaratory judgment that existing Ohio Covid-19 health-related mandates related to mask usage, social distancing, and vaccines are in violation of the United States and Ohio Constitutions.  Further,

Plaintiff seeks a declaratory judgment that Defendants' management and processing of Ohioans' Covid-19 health care data and health care information – including that of Plaintiff and her minor daughter, is in violation of the Ohio Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

a.  Declare that the Defendants' masking mandate and Defendants implementation of the Ohio Covid Health Care System is void and without legal force or effect;

c.  Declare that the institution of the policies and actions undertaken by Defendants are not narrowly tailored to combat a potentially deadly viral threat given such policies and actions were never the least restrictive means of addressing such presumed compelling interest;

d.  Declare that the policies and the actions taken by Defendants are in violation of the U.S. and Ohio Constitutions and contrary to the laws of the United States and the State of Ohio;

e.  Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing their constitutionally-defective policies and actions and from taking any other action that is not in compliance with the Court's ruling;

f.  Grant Plaintiff a trial by jury of all such triable issues in this matter; and

g.  Grant such other and further relief as may be just, equitable, and proper including without limitation, an award of attorneys' fees and costs to Plaintiff.

Terpsehore Maras, Plaintiff
410 Superior Ave., #14597
Cleveland, OH 44114

Dated:  December 16, 2021